[No. D004016. Fourth Dist., Div. One. Sept. 14, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIAN LYNN BEACH et al., Defendants and Appellants.

**[Opinion certified for partial publication.†]**

---

† Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of sections III and IV.

958

COUNSEL

A. P. Zmurkiewicz and Douglas W. Grinnell, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jay M. Bloom and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KREMER, P. J.—Marian Lynn Beach and her father Marion C. Neal were convicted by a jury of stealing her child from her husband's custody. (Pen. Code, §§ 278.5, subd. (a), 278.) Neal was additionally convicted of second degree burglary (Pen. Code, § 459) and battery (Pen. Code, § 242).

On appeal, both Beach and Neal attack their child-stealing convictions on the basis the California court lacked jurisdiction to award custody to Beach's husband, Ronald Beach, and on the basis the court erroneously instructed the jury on their defense of necessity. Neal additionally contends the court erred in permitting the prosecution to amend the information and in instructing the jury on the crime of battery.

FACTS

Marian married Ronald in February 1976 in Hobbs, New Mexico. They lived in Hobbs for about six months and then moved to Millington, Tennessee, when the Navy transferred Ronald there for schooling. In October 1977, their daughter Crystal was born in Tennessee. About a month later, the Navy transferred Ronald to San Diego.

In December 1979, Ronald and his mother Mitzi Beach drove to New Mexico. He wanted to visit his daughter and was considering taking her back to San Diego to live with him on a permanent basis. He did not tell Marian they were coming. They arrived at Marian's house after dark. No one was home so they waited in their car. When Marian returned in a pickup truck with two men and Crystal, Ronald went up to the man who was holding Crystal in his lap, said "Let me have my daughter." The man handed Crystal to him. Ronald got into his own car with Crystal. His mother Mitzi remained outside the car. The larger of the two men approached Mitzi. The man seemed angry. Mitzi fumbled in her purse and took out a plastic squirt gun she had taken away from her nephew while he

had been playing with it in the car. She told the man "Please don't come any further. Don't come toward me." The man said "You are not going to do anything with that thing." He hit the gun and broke it. Mitzi got in the car.

Marian came over to Ronald, affectionately stroked his cheek and said "Don't do this." Ronald said he was taking Crystal with him for a two-week visitation in San Diego. He insisted on leaving immediately. He told her there was somebody waiting for him in Big Springs, Texas, and if he did not show up in Big Springs, Texas, by midnight this person would come to find out why. One of Marian's friends had blocked in Ronald's car with the pickup truck. Marian told her friend to move the truck. Ronald and Mitzi left with Crystal.

Ronald and Mitzi drove to San Diego with Crystal and stayed at Mitzi's home in the University City area. Crystal cried and screamed if anyone other than Ronald or Mitzi tried to change her. Ronald took her to Balboa Naval Medical Center. He thought she might have been molested.

On January 11, 1980, Ronald filed for divorce and received a temporary custody order. The order restrained both Ronald and Marian from removing Crystal from California. An order to show cause hearing was set for January 31, 1980.

Marian called Ronald and told him he had better return Crystal to her. Ronald told her he was not through visiting and hung up. Fifteen or twenty seconds later, Marian's father Neal called Ronald and said "You are on my shit list, buddy." Ronald repeated he was not finished visiting with Crystal.

On January 21, Ronald, his father and uncle went to the Ambassador Inn in San Diego where they had learned Marian was staying. They served Marian with the divorce papers and temporary custody order. Marian left San Diego.

On January 29, two days before the hearing, Marian returned to San Diego with her father Neal. At 9 a.m. Marian and Neal went to Mitzi's house where Crystal was staying. Mitzi was babysitting Crystal while Ronald was at work. Ronald had not given anyone permission to take Crystal.

When Mitzi opened the door, she inadvertently unlocked it while trying to affix the chain. Mitzi told Marian and Neal to go away because the attorney had advised her not to allow Marian or Neal to contact Crystal before the hearing. Neal pushed open the door. He grabbed Mitzi by the hair and banged her head against the door jamb. Marian grabbed Crystal

and ran to the car. Mitzi tried to restrain Neal but was unable. Neal got into the car and they drove away.

At the January 31 hearing, Ronald was awarded custody of Crystal. Marian did not appear.

Ronald hired an attorney to help him locate Crystal. At one point, Ronald went to Atlanta, Texas, where he saw Crystal in a restaurant. He contacted the local sheriff's office but they were unable to retrieve Crystal because Marian and Neal fled with Crystal.

In April 1985, an F.B.I. special agent executed an arrest warrant for unlawful flight to avoid prosecution at a house in Odessa, Texas, where Marian, Crystal and Neal were living under assumed names. Crystal was found inside. Neal was hiding in the bathroom. Marian's mother, who was also there, called Marian at work and told her what had happened. Marian returned home and surrendered.

## DISCUSSION

### I

Marian[2] contends she could not be convicted of child-stealing under Penal Code section 278.5 because the January 11, 1980, temporary custody order was void for lack of subject matter jurisdiction.

Penal Code section 278.5, subdivision (a) in pertinent part, provided: "Every person who *in violation of a custody decree* takes, retains after the expiration of a visitation period, or conceals the child from his legal custodian . . ." is guilty of child stealing. Section 278.5 requires there must exist an order regarding custody rights. (*People* v. *Howard* (1984) 36 Cal.3d 852 [206 Cal.Rptr. 124, 686 P.2d 644].)

---

[2] Neal also challenges his conviction on the basis the court lacked subject matter jurisdiction when it issued the January 11, 1980, temporary custody order. However, Neal was not convicted of violating Penal Code section 278.5, but rather of violating section 278 which does not depend on the existence of a custody order.

Neal argues he was acting as Marian's agent "in taking exclusive possession of her daughter." This argument was rejected by the Supreme Court in the context of Penal Code section 278. The Supreme Court explained whatever right a parent has, in the absence of a custody order to invade another's custody of the child may not be delegated to an agent, because that would result "in untold confusion" and would provoke breaches of the peace in that the custodial parent would be "at the mercy of persons acting as alleged agents of the other parent." (*Wilborn* v. *Superior Court* (1959) 51 Cal.2d 828, 831 [337 P.2d 65].) "Such consequences would not promote the interests of the parents, the child or the public welfare." (*Ibid.*)

██ The Uniform Child Custody Jurisdiction Act (UCCJA) (Civ. Code,[3] § 5150 et seq.) is the exclusive method of determining subject matter jurisdiction in California custody cases. (*Plas* v. *Superior Court* (1984) 155 Cal.App.3d 1008 [202 Cal.Rptr. 490].)

The UCCJA involves a multistep process. Initially, the court must determine whether it has jurisdiction over the particular custody dispute. The jurisdictional determination is a "vitally important preliminary decision." (*State* ex. rel. *State of Pa.* v. *Stork* (1982) 56 Ore.App. 335 [641 P.2d 660, 664].) It should not be made "in a rush to judgment" but rather "after a full and fair evidentiary hearing." (*Cole* v. *Superior Court* (1985) 173 Cal.App.3d 265, 272 [218 Cal.Rptr. 905].)

The UCCJA limits jurisdiction to the four grounds listed in section 5152. Section 5152 provides: "(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if the conditions as set forth in any of the following paragraphs are met:

"(a) This state (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state.

"(b) It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships.

"(c) The child is physically present in this state and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent.

"(d) (i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (a), (b), (c), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child,

---

[3] All statutory references are to the Civil Code unless otherwise specified.

and (ii) it is in the best interest of the child that this court assume jurisdiction.

"(2) Except under paragraphs (c) and (d) of subdivision (1), physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.

"(3) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody."

█ ██ █ ██ Here, Marian points out Ronald's petition[4] affirmatively negates two of the jurisdictional bases of the UCCJA—"home state" and "vacuum" jurisdiction (i.e., no other state having jurisdiction or declining jurisdiction in favor of California) since the petition affirmatively shows California was not Crystal's "home state" because Crystal had lived in New Mexico (not California) for the six months preceding the petition (§ 5152, subd. (a))[5] and New Mexico, as Crystal's "home state," had jurisdiction which it had not declined to exercise (§ 5152, subd. (d)). Marian further asserts the court here lacked subject matter to issue the order because Ronald's petition failed to affirmatively allege facts showing Crystal had any significant connections to California and that any substantial evidence existed in California about Crystal's present or future care, protection, training and personal relationships (§ 5152, subd. (b)), and Ronald failed to allege specific facts showing Crystal had been abandoned or neglected or needed emergency protection from threatened mistreatment or abuse (§ 5152, subd. (c)). Marian argues since Ronald's petition failed to affirmatively allege any of these bases for jurisdiction, the January 11 temporary custody order was void for lack of subject matter jurisdiction and therefore she could not be convicted of violating Penal Code section 278.5.

Initially, we observe Ronald's declaration does not, on its face, negate all jurisdictional grounds under section 5152, e.g., it is silent as to whether Crystal had significant connections to California and recites a threatened removal from California, a factor we discuss below.

---

[4] A petitioner for a temporary child custody order must attach a declaration meeting the requirements of section 5158. (§ 4600.1, subd. (a).)

[5] Section 5151, subdivision (5) defines "home state" as "the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period."

The declaration form which Ronald filed was created by the Judicial Council to comply with section 5158 of the UCCJA. Section 5158 provides: "(1) Every party in a custody proceeding in this first pleading or in an affidavit attached to that pleading shall give information under oath as to the child's present address, the places where the child has lived within the last five years, and the names and present addresses of the persons with whom the child has lived during that period. In this pleading or affidavit every party shall further declare under oath as to each of the following whether:

"(a) He has participated, as a party, witness, or in any other capacity, in any other litigation concerning the custody of the same child in this or any other state.

"(b) He has information of any custody proceeding concerning the child pending in a court of this or any other state.

"(c) He knows of any person not a party to the proceedings who has physical custody of the child or claims to have custody or visitation rights with respect to the child.

"(2) If the declaration as to any of the above items is in the affirmative the declarant shall give additional information under oath as required by the court. The court may examine the parties under oath as to details of the information furnished and as to other matters pertinent to the court's jurisdiction and the disposition of the case.

"(3) Each party has a continuing duty to inform the court of any custody proceeding concerning the child in this or any other state of which he obtained information during this proceeding."

■ The primary intent of section 5158 is to inform the court of the existence of other custody litigation about the child. It tells the court whether the proceeding before it involves an initial custody determination or a modification of a preexisting order (perhaps issued by another state) or whether custody proceedings are already pending in another state. The existence of other custody litigation directly and immediately impacts the court's consideration of jurisdiction; it creates a presumption that jurisdiction properly lies elsewhere. The existence of other custody proceedings also triggers certain procedures which the court must follow in determining jurisdiction under the UCCJA such as communicating with the other court.

■ If the section 5158 declaration indicates the proceeding before the court is a modification of another court's order, the California court must

not modify the decree unless it appears the state which issued the decree does not have jurisdiction or has declined to exercise jurisdiction to modify the order and it appears California has jurisdiction. (§ 5163.) Further, the California court is required to request from the court which issued the order a certified copy of the transcript and other court documents before it may modify the custody order. (§ 5171.) If the section 5158 declaration indicates custody litigation is pending elsewhere, then the California court must not exercise jurisdiction to resolve the custody dispute unless the other court stays its proceedings in favor of California. (§ 5155, subd. (1).) Thus, under the UCCJA's statutory scheme, the court must be informed of the existence of other custody litigation at the earliest possible time, i.e., when a petition for custody is filed.

A secondary purpose of the section 5158 declaration is to give the court information about where the child has resided during the past five years (information which is relevant to the "home state" determination) and information about the parties with whom the child has lived during those years who therefore may have an interest in the litigation or may be able to supply information about the child.

The section 5158 declaration does not purport to cover all the jurisdictional grounds listed in section 5152 nor does anything in section 5158 or the UCCJA generally show an intent for the section 5158 declaration to be used as the sole basis for the jurisdictional determination.[6] Rather, the section 5158 declaration is intended to alert the court to the existence of other litigation or other interested parties and to give the court some information relevant to the "home state" determination.

Marian cites no authority to the contrary[7] nor has our research disclosed any cases to support her argument that an interim custody order pending a hearing is void *ab initio* unless the petition for initial custody affirmatively alleges specific facts establishing the grounds for jurisdiction listed in section 5152. ██ ██ ██ ██ Rather, case law holds California superior

---

[6] For example, subdivision (2) of section 5158 provides the court "may examine the parties under oath as to details of the information furnished [in the declaration] and as to other matters pertinent to the court's jurisdiction and the disposition of the case." This language supports a conclusion the section 5158 declaration is not intended to provide a complete basis for determining jurisdiction.

[7] Neither of the two cases which Marian cites to generally supports her position—*Plas* v. *Superior Court, supra,* 155 Cal.App.3d 1008 and *In re Marriage of Hopson* (1980) 110 Cal.App.3d 884 [168 Cal.Rptr. 345]—involve attacks on the sufficiency of allegations to support issuance of an interim custody order pending a hearing. Rather, these cases involve attacks on the court's findings following hearings on the jurisdictional issue. Furthermore, both of these cases involved custody proceedings when there existed other custody litigation about the child (pending in *Plas,* preexisting in *Hopson*), facts which are specifically required to be disclosed in the section 5158 declaration.

courts are generally empowered to decide custody issues (see *Peery* v. *Superior Court* (1985) 174 Cal.App.3d 1085, 1095 [219 Cal.Rptr. 882]) and have inherent jurisdiction to determine whether they have jurisdiction over a case (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 282 [109 P.2d 942, 132 A.L.R. 715]; *Palm* v. *Superior Court* (1979) 97 Cal.App.3d 456, 462-463 [158 Cal.Rptr. 786]), and that a court's determination of subject matter jurisdiction (which is implicit in every order issued) is presumed correct (8 Witkin, Cal. Procedure (3d ed. 1985) Attack on Judgment in Trial Court, § 11, p. 414) and is not subject to collateral attack[8] if the jurisdictional determination is factually based (as is the UCCJA determination) (*Peery* v. *Superior Court, supra,* 174 Cal.App.3d at p. 1095).[9]

■ Moreover, Ronald's petition also alleged that Marian would "remove the minor child from the jurisdiction of the Court unless she is restrained and enjoined from so doing." This was the basis on which the court issued the interim custody order. The question thus presented is whether given the petition filed, the court had the power to issue an interim custody order pending a hearing to prevent an abduction. The UCCJA does

---

[8] Marian's attack here is collateral, not direct. A direct attack "is . . . a *proceeding instituted for the specific purpose* of vacating, reversing or otherwise attacking the judgment [or order]." (8 Witkin, *supra,* § 1, p. 403, italics in original.) "A collateral attack is indirect: It is made, not in a proceeding brought for the specific purpose of attacking the judgment [or order] . . . but *in some other proceeding having a different purpose.*" (*Id.* at § 6, p. 410, italics in original.)

Here, Marian is appealing a criminal conviction, seeking reversal of a criminal judgment. This is not a direct appeal from the issuance of the interim custody order. Her attack on the interim custody order is a collateral attack, made as a part of her direct attack on her criminal conviction.

[9] In *Peery* v. *Superior Court, supra,* 174 Cal.App.3d 1085, the court held a wife could not collaterally attack an initial award of custody pursuant to a consent divorce degree on the basis no jurisdictional findings were made. The *Peery* court held the doctrine of res judicata barred the introduction of extrinsic evidence and the collateral attack. The court noted there are exceptions to the general rule that an order or judgment cannot be collaterally attacked by the introduction of extrinsic evidence, but held none of the exceptions applied to the case before it. The court stated: "Clearly, the determination of a custody issue in a superior court empowered to decide such matters generally is not a manifest abuse of authority. The judgment, when entered, did not substantially infringe on the jurisdiction of any other tribunal, because the parties had not filed proceedings in any other tribunal then. The superior court, as stated, did not lack the capability to adequately determine its jurisdiction over a custody matter. The jurisdictional issue, existence of the seminal facts under the UCCJA, is clearly factual, not legal. We know of no strong policy against acting beyond jurisdiction in such a situation (since the aid of no other tribunal had then been sought such as might conflict with the decision of the California court). Finally, although the jurisdictional issue was not 'litigated' in the sense that arguments were made and evidence presented, it was 'litigated' in the same way that all the issues underlying a default or consent judgment are litigated, by the presentation of the issue to the court and its necessary implied determination that it has jurisdiction to act." (*Id.* at p. 1095.)

We note that such an analysis could also be applied to the facts of this case.

not specifically address the issuance of interim custody issues,[10] but the UCCJA is concerned with the problem of abducting and concealing children in custody disputes.

■ The UCCJA was enacted in response to concern over the shifting of children from state to state in custody battles as courts permitted "custody claimants to sue in the courts of almost any state, no matter how fleeting the contact of the child and family was with the particular state, with little regard to any conflict of law rules." (9 West's U. Laws Ann. (1979), comrs. note, p. 112, [hereafter Comments].) As a result of this state of affairs, with courts freely modifying custody orders and granting custody to whoever currently had possession of the child, parents were encouraged to resort to self-help and child-stealing to the child's detriment.[11]

The UCCJA seeks to promote the best interest of the child by giving greater stability to custody decrees through limiting jurisdiction to decide custody matters and enabling courts "to arrive at a fully informed judgment which transcends state lines and considers all claimants, residents and non-residents, on an equal basis and from the standpoint of the welfare of the child." (Comments, *supra,* at p. 114; see also *Grynkewich* v. *McGinley* (1985) 3 Conn.App. 541 [490 A.2d 534, 537].) Through procedures calling for notice, a hearing and communications among the courts (see §§ 5153-5157, 5168), the UCCJA seeks to "[d]eter abductions and other unilateral removals of children undertaken to obtain custody awards." (§ 5150, subd. (e).)

California adopted the UCCJA in 1974. Two years later, the California Legislature enacted Civil Code section 4600.1 permitting the courts to issue temporary custody orders in a proceeding for dissolution of marriage. In

[10] In 1980, Congress enacted the Parental Kidnapping Prevention Act (PKPA) which, among other things, provides for full faith and credit to be given to child custody orders if the jurisdictional requirements of the PKPA are met. (28 U.S.C. § 1738A.) These requirements are essentially the same as those of the UCCJA. The PKPA expressly states a "custody determination" includes a temporary custody order. (28 U.S.C. § 1738A (b)(3).) Thus, the PKPA implicitly makes the UCCJA jurisdictional requirements applicable to temporary custody orders. (See Donigan, *Child Custody Jurisdiction: New Legislation Reflects Public Policy Against Parental Abduction,* 19 Gonzaga L.Rev. 1 (1983/84).)

[11] The commissioners who drafted the UCCJA commented: "In this confused legal situation the person who has possession of the child has an enormous tactical advantage. Physical presence of the child opens the doors of many courts to the petitions and often assures him of a decision in his favor. It is not surprising then that custody claimants tend to take the law into their own hands, that they resort to self-help in the form of child stealing, kidnapping, or various other schemes to gain possession of the child. The irony is that persons who are good, law-abiding citizens are often driven into these tactics against their inclinations; and that lawyers who are reluctant to advise the use of maneuver of doubtful legality may place their clients at a decided disadvantage." (Comments, *supra,* comrs. note, p. 113.)

section 4600.1, the Legislature provided that if there is no custody agreement, understanding or stipulation by the parties, "the court may, if jurisdiction is appropriate, enter an ex parte [temporary custody] order, set a hearing date within 20 days, and issue an order to show cause on the responding party." (§ 4600.1, subd. (c).)

Section 4600.1 was adopted in 1976 by chapter 1399. (Stats. 1976, ch. 1399, § 2, p. 6312.) Chapter 1399 was enacted in response to a justice department study on child custody and abduction problems occurring during and after a dissolution of marriage, including the problem of one parent taking and concealing a child before any custody decree had been issued. (8 Pacific L.J. 315 (1977).)

In chapter 1399, the Legislature additionally authorized the district attorney to take all action necessary to locate a party and child when a custody issue is pending and the whereabouts of the party in possession of the child are unknown or there is reason to believe the party will not appear or when a custody decree has been entered and the child is being detained in violation of the decree. (§ 4604, subds. (a), (b); Stats. 1976, ch. 1399, § 3, p. 6312.)

The Legislature also amended the UCCJA to provide that when a California court declines jurisdiction because the petitioner has wrongfully brought the child to California, the California court is to notify the parent in the other state and the prosecuting authority of that state and must, if requested by the other state, order the California petitioner to appear with the child in proceedings initiated in the other state. (§ 5157, subd. (3); Stats. 1976, ch. 1399, § 5, p. 6313.) The Legislature further amended the UCCJA to provide the California courts with the power to order a petitioner to return a child to the parent in the other state and, if necessary, to place the child temporarily in a foster home pending return of the child to the other parent. (§ 5157, subd. (4); Stats. 1976, ch. 1399, § 5, p. 6313.)

Finally, in addition to providing for an interim custody order, mechanisms for enforcing the court's order and procedures to follow to insure a custody matter will be determined in the most appropriate forum, the Legislature also enacted Penal Code section 278.5 making it a crime to detain or conceal a child in violation of a custody order. (Stats. 1976, ch. 1399, § 11, p. 6315.)

■ Thus, the adoption of section 4600.1 was part of a comprehensive scheme to insure that pending a dissolution of marriage and resolution of the child custody issue there would be mechanisms available, including the issuance of interim custody orders and criminal sanctions for their

violation, to resolve custody disputes in an orderly manner and to deter abductions. This is consistent with the aims of the UCCJA.

We observe that a threatened abduction of the child represents an emergency type situation since it threatens the welfare of the child and the court's ability to make a meaningful determination of jurisdiction. Under section 5152, subdivision (l)(c) of the UCCJA, the drafters intended to retain and reaffirm *"parens patriae* jurisdiction . . . which a state must assume when a child is in a situation requiring immediate protection."* (Comments to UCCJA, *supra,* p. 124.) ▇ A court is authorized to assume jurisdiction under section 5152, subdivision (1)(c) when the child is physically present in this state and "it is necessary in an emergency to protect the child because he has been . . . threatened with mistreatment . . . ." The courts have recognized when a petition contains allegations of an emergency situation, it is proper for a court to issue an interim custody order to protect the child pending a hearing. (See *Cole* v. *Superior Court, supra,* 173 Cal.App.3d 265; *Johnson* v. *District Court, etc.* (Colo. 1982) 654 P.2d 827, 829; *Nelson* v. *Nelson* (Fla.App.3d Dist. 1983) 433 So.2d 1015, 1019; Note, *Temporary Custody Under the Uniform Child Custody Jurisdiction Act: Influence Without Modification* (1977) 48 U. Colo. L.Rev. 603.)

Given the impetus for the enactment of the UCCJA, i.e., a concern for the effect of abductions and concealment on a child's welfare, a threatened abduction represents a threatened mistreatment. Issuance of an interim custody order pending a hearing to provide sanctions for an abduction is consistent with the UCCJA's purposes and insures there will not be a period between the filing of the petition and the jurisdictional determination where the parents will be encouraged to shift a child from state to state to defeat an exercise of jurisdiction.

Moreover, the UCCJA itself explicitly gives a court temporary jurisdiction over a child when there has been an abduction, even when the court declines to exercise jurisdiction. ▇ Under section 5157 if the court elects to decline jurisdiction because the California petitioner has wrongfully taken the child from another state or has "engaged in similar reprehensible conduct," the California court may nevertheless assume temporary jurisdiction over the child and order the child returned to the parent in the other state or order the child be placed in a foster home pending return. ▇ Thus, the UCCJA itself implicitly recognizes the need for courts to assume interim jurisdiction over a child when an abduction is threatened and California has provided explicit authorization for interim orders in section 4600.1.

Here, Marian's legal options when the California court issued the January 11 interim custody order were to have the interim order vacated or

stayed by making a motion in the trial court or by petitioning this court for relief, to have sought relief in the New Mexico courts, thereby initiating communications between the California and New Mexico courts over the jurisdictional issue, or to have appeared at the January 29 hearing to challenge an award of custody to Ronald. Marian took none of these legal options. Instead, she chose an illegal option, taking her daughter Crystal in violation of the January 11 interim custody order. Her conduct violated the spirit of the UCCJA and was criminal. No reversal is required on this ground.

## II

■ Marian and Neal complain the court did not properly instruct the jury on the defense of necessity.

The court instructed the jury as follows: "You may not consider the defense of necessity *when the issue of child custody is pending before a court or is to be determined by a court of law*; unless under all of the evidence you shall believe the safety of the child was in immediate peril. The evidence must show a good faith belief of such peril and is objectively reasonable under the totality of the circumstances." (Italics added.)[12]

Marian and Neal assert the pendency of a child custody hearing is irrelevant to the necessity defense and that the instruction incorrectly stated the law by narrowing the defense or making it less available because the issue of child custody was pending.

The necessity defense is very limited and depends on the lack of a legal alternative to committing the crime. It excuses criminal conduct if it is justified by a need to avoid an imminent peril and there is no time to resort to the legal authorities or such resort would be futile. (See *People* v. *Lovercamp* (1974) 43 Cal.App.3d 823, 831-832 [118 Cal.Rptr. 110, 69 A.L.R.3d 668].) As we stated in *People* v. *Patrick* (1981) 126 Cal.App.3d 952, 960 [179 Cal.Rptr. 276]: ". . . although the exact confines of the necessity defense remain clouded, a well-established central element involves the emergency nature of the situation, i.e., the imminence of the greater harm which the illegal act seeks to prevent. [Citation.] The commission of a crime

---

[12]The court also instructed the jury: "Conduct which would otherwise constitute an offense is justified if it is necessary in an emergency to avoid peril which is about to occur through no fault of the defendant, and if the peril is of such gravity that, according to ordinary and reasonable standards of morality and intelligence, the desirability and urgency of avoiding the peril clearly outweigh the desirability of avoiding the criminal act charged against the defendant."

cannot be countenanced where there exists the possibility of some alternate means to alleviate the threatened greater harm. [Citation.]" (Fn. omitted.)

Here the pendency of a child custody hearing was Marian's and Neal's legal alternative to child stealing. The hearing was scheduled to occur within two days of when Marian and Neal took Crystal. The pendency of the child custody hearing was relevant to the jury's determination whether Marian and Neal had a legal alternative to committing the crime.

Further, the instruction as given was, if anything, more favorable to Marian and Neal than the law generally provides since the defense of necessity, as outlined in *People* v. *Lovercamp, supra,* 43 Cal.App.3d at page 832, requires the individual committing the crime to report to the proper authorities immediately after attaining a position of safety from the peril. Here, the evidence showed Marian and Neal never reported the crime to the authorities, failed to appear at the scheduled custody hearing, did not seek to obtain legal custody of Crystal,[13] and deliberately evaded the authorities for over five years.

Marian and Neal contend the court erred in refusing to give their requested instruction number 2. This instruction stated: "If you find that the defendant took a child from a person who had custody of the child pursuant to a court order and that the defendant intended to deprive the person of such custody, but that the defendant believed that he or she did so out of necessity to avoid a harm or evil to the child, the defendant is entitled to an acquittal."

The court properly refused to give this instruction. It misstates the law. Under the necessity defense it is not sufficient to show only that the defendants believed they were acting out of a necessity to avoid a harm or evil, it is also necessary to show there was an emergency justifying the act. Further, it is not sufficient to show the individual merely believed he or she was avoiding a harm or evil to the child, it is necessary to show the belief was objectively reasonable; good intentions alone do not excuse a crime. (See 1 Witkin, Cal. Crimes (1963) Defenses, § 249, p. 233; 1985 supp., p. 245.) As explained in the *Lovercamp* case: "The question that must be resolved [in the necessity defense] involves looking to all the choices available to the defendant and then determining whether the act . . . was the *only viable and reasonable choice available.*" (*People* v. *Lovercamp, supra,* 43 Cal.App.3d at p. 827, italics added.)

Marian and Neal also complain the court erroneously rejected their requested instruction on the burden of proof for the necessity defense.

[13] Marian upon her return to New Mexico filed an action for dissolution and custody, but later abandoned the action and did not further seek to obtain legal custody of Crystal.

Their proffered instruction stated: "In order to establish the defense of necessity, the defendant need only raise a reasonable doubt as to whether the desirability and urgency of avoiding the harm or evil clearly outweigh the desirability of avoiding the criminal act charged against him or her.

"In other words, the prosecution has the burden of proving beyond a reasonable doubt, that the desirability and urgency of avoiding the harm or evil do *not* clearly outweigh the desirability of avoiding the criminal act charged against the defendant."

This instruction is also an incorrect statement of the law and the trial court properly refused to give it.

■ Marian and Neal patterned this instruction after an instruction given in the context of a duress defense. (See *People* v. *Graham* (1976) 57 Cal.App.3d 238, 240 [129 Cal.Rptr. 31].) They argue it should have been given in this case because the necessity and duress defenses are similar and there are no authorities holding such an instruction is not appropriate in the context of a necessity defense. They are wrong on both points.

The court in *People* v. *Condley* (1977) 69 Cal.App.3d 999 [138 Cal.Rptr. 515], certiorari denied 434 U.S. 988, differentiated between the two defenses. The duress defense negates an element of the crime charged (the capacity to commit the crime as defined in Pen. Code, § 26) and therefore the defendant need raise only a reasonable doubt as to the existence or nonexistence of this fact. The necessity defense does not negate any element of the crime but represents a public policy decision not to punish such an individual despite the proof of all the elements of the crime. (*Id.* at pp. 1009-1013.) "[B]y definition, the [necessity] defense is founded upon public policy and provides a justification distinct from the elements required to prove [the crime]." (*Id.* at p. 1013.) Unlike duress, the necessity defense involves a threat in the "immediate future" rather than an imminent threat to one's life; the conditions of a necessity defense are not in derogation of the crime's intent element. (*Id.* at p. 1012.) "Necessity is an affirmative public policy defense, in effect a plea in avoidance and justification, which comes into focus only after all elements of the offense have been established." (*People* v. *Waters* (1985) 163 Cal.App.3d 935, 938 [209 Cal.Rptr. 661].) The trial court properly refused to instruct the jury Marian and Neal had to raise only a reasonable doubt as to the necessity justifying the commission of their crimes.

III, IV*

. . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Work, J., and Todd, J., concurred.

Appellants' petitions for review by the Supreme Court were denied December 2, 1987.

---

*See footnote, page 955, *ante.*