19 Cal.App.4th 678 (1993)
23 Cal. Rptr.2d 574
In re JOSEPH D., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
MARK D., Defendant and Appellant.
Docket No. D018691.
Court of Appeals of California, Fourth District, Division One.
October 19, 1993.
*680 COUNSEL
Judith Klein, under appointment by the Court of Appeal, for Defendant and Appellant.
Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel, and Terri L. Richardson, Deputy County Counsel, for Plaintiff and Respondent.
Linda M. Fabian, under appointment by the Court of Appeal, for Minor.
OPINION
TODD, Acting P.J.
Mark D. (Mark), a resident of Pennsylvania and the father of Joseph D. (Joseph), appeals a judgment under Welfare and Institutions Code section 300 declaring Joseph a dependent of San Diego County *681 Juvenile Court. Mark, who had been awarded custody of Joseph in an earlier proceeding in family court in Pennsylvania, contends the San Diego proceeding violated the Uniform Child Custody Jurisdiction Act (Uniform Act).[1] Mark also contends the case should have been transferred to Pennsylvania under the doctrine of forum non conveniens. Additionally, Mark assigns error to (1) the failure to appoint an independent expert to evaluate Joseph, and (2) the visitation order because it delegates too much authority to Joseph's therapist.

FACTS
This appeal stems from a dependency petition that the San Diego County Department of Social Services (Department) filed on August 18, 1992, in San Diego County Juvenile Court on behalf of eight-year-old Joseph, alleging Joseph was a person who came under Welfare and Institutions Code section 300, subdivision (d), because he had been sexually abused by his stepbrother, David O., and by his father, Mark. Before relating the subsequent history of the case, we will outline the factual background surrounding Joseph and his parents.
Joseph was born on October 24, 1983, the son of Mark and Anna B. (Anna), who had married in 1976 in Pennsylvania. Anna and Mark separated in 1986; in October 1987, a decree of divorce was granted in Pennsylvania. From July 1986 to June 1987, Anna and Mark shared custody of Joseph through an informal verbal agreement. In June 1987, Anna moved with Joseph to California. Joseph visited his father in Pennsylvania during the summer of 1988 and Christmas 1988. In the spring of 1989, Mark moved to Las Vegas, Nevada, with his new wife, and Joseph visited his father there on three occasions during school breaks. Joseph disclosed there was sexual contact, with his stepbrother David, who was two years older, during the first of these visits. Mark and Anna agreed on how Mark would protect and supervise Joseph on future visits.
In June 1990, Mark and Anna agreed Joseph would attend school in Pennsylvania the following year. In August 1990, Joseph moved to Pennsylvania with his father. Anna visited Joseph at Christmas and the following Easter. In June 1991, Joseph moved to San Diego and lived with his mother until August 15, 1991. On July 29, 1991, Anna filed a motion in San Diego *682 County Superior Court for custody of Joseph, among other things. On August 14, 1991, Mark obtained from the Court of Common Pleas of Erie County, Pennsylvania, an order that found jurisdiction over Joseph was with the Pennsylvania court and directed Anna to immediately relinquish custody of Joseph to Mark. The order also set up a custody counseling conference in Erie, Pennsylvania, for October 22, 1991, and directed Anna to appear at the conference.
Anna traveled to Pennsylvania in mid-October 1991 and visited with Joseph during the weekend of October 18 through October 20. On October 20, while driving Joseph to his father's home, Joseph told Anna that the sexual contact by David was continuing and was not a one-time occurrence. Subsequently, the Erie County Office of Children and Youth investigated a report of suspected child abuse and determined the abuse allegations unfounded. The Office of Children and Youth determined, after interviewing David and Joseph, that while there was some mutual touching of the genitals, the contact was more horseplay than assaultive behavior.
Meanwhile, the family court counseling conference was conducted on October 23, 1991, and it was recommended to the Pennsylvania court, among other things, that custody of Joseph shall be shared by the natural parents with the primary residence being Mark's, and Anna shall have custody for the summer and Christmas breaks from school. The Court of Common Pleas of Erie County adopted the recommendations by order dated October 23, 1991. On October 28, 1991, the Court of Common Pleas amended its October 23d order to give Anna partial custody of Joseph until she returned to California on November 3, 1991, to provide a $2,000 bond shall remain in effect and to have the Office of Children and Youth reinterview Joseph and report back to the court. On November 1, 1991, the Court of Common Pleas issued a new order that stated, in part: "[A]fter presentation of the testimony of the parties and the minor child, this Court believes that the natural mother presents a risk of flight with the minor child, and finds that it is in the best interests of the minor child that the natural mother's rights to partial custody be suspended pending her return to California." Among other things, the order also directed psychological evaluations of Joseph, Anna and Mark be prepared and submitted to the court and ordered Anna to have supervised visitation until she returned to California.
In March 1992, the custody counselor for the Pennsylvania court conducted another family court counseling conference and determined there was not enough of a change of circumstances to warrant a change of custody from the October 23, 1991, order; consequently the court continued the prior order giving Mark primary custody. Anna took exception, and a trial was scheduled for June 26, 1992.
*683 On June 10, 1992, Joseph came to California to begin his summer vacation with his mother. On June 12, 1992, Anna took Joseph to an already scheduled appointment with Yanon Volcani, a licensed clinical psychologist.
In late June 1992, Joseph and his mother traveled to Pennsylvania for the trial, which was conducted on June 26 and 29. They returned to San Diego in July 1992, and Joseph resumed his therapy sessions with Volcani.
On July 31, 1992, the Court of Common Pleas issued its written findings and order, following the trial. The Pennsylvania court awarded Mark physical custody of Joseph during the school year and awarded Anna partial custody of Joseph during the summer and Christmas and Easter vacation breaks. Among other things, the Pennsylvania court made the following findings of fact:
"12. At the present time, the major source of anxiety in Joseph's life is the ongoing custody dispute of his parents which, without question, is having a negative impact on the quality of his life.
"13. The custody dispute arises almost exclusively out of Anna [B.]'s concern that Joseph is not safe in Mark [D.]'s household. Her initial concern arose out of statements made by Joseph to her and her husband during periods of partial custody.
"14. Mrs. [B.] is genuinely concerned that her son has been sexually abused by Mr. [D.]'s ten (10) year old stepson, David, and that this conduct will continue because of Mr. [D.]'s failure to take the necessary steps to prevent it.
"15. Prior to October 19, 1991 and most probably prior to the summer of 1991, when Joseph was age six (6) or seven (7) and his stepbrother, David, was age eight (8) or nine (9), they engaged in inappropriate touching of each other's genitals. This behavior included episodes where David `flicked' Joseph's penis and placed toys on it, and there is a report that on one occasion David rubbed his erect penis against Joseph's. On a number of occasions it appears that David was the initiator of the conduct and more aggressive.
"16. There has been no further inappropriate touching since at least October 1991.
".... .... .... .... .... .... ....
"18. Considering the ages of the youngsters at the time of the incidents ... as well as the nature and circumstances of the conduct, the inappropriate touching of Joseph's genitals by David... does not constitute a pattern *684 of `severe sexual abuse,' `sexual battery' or `sexual molestation.' Nevertheless, it is not acceptable behavior and all reasonable steps must be taken to prevent any further occurrence.
"19. Since discovering the nature and extent of the contact between the boys[,] Mr. D. and his wife have taken effective steps to prevent further episodes. David has participated in counseling and a special program for children of alcoholic parents. (David's natural father is an alcoholic.)
"20. There is no indication whatsoever that Joseph has been at risk of being `sexually molested' by his ten (10) year old brother at any time since October of 1991 and there is every indication that the conduct in question has ceased."
Meanwhile, in San Diego in mid- to late July, Joseph had begun describing to Volcani touching by David that was far more serious and chronic than previously reported and also named his father and stepmother as perpetrators. On August 4, 1992, the Department received a referral and began an investigation of the purported sexual abuse of Joseph. On August 7, 1992, Joseph was interviewed and examined at the Center for Child Protection of Children's Hospital. During the interview, Joseph related that David had stuck plastic men up his rectum and had tried to make Joseph suck his penis and that Mark had urged Joseph to suck and touch his penis. Also, Joseph said both David and Mark had sodomized him. Additionally, Joseph reported some abuse by his stepmother. No unusual physical findings were noticed during the medical examination.
Joseph was scheduled to return to Pennsylvania on August 11, 1992. On that date, the family court of San Diego County Superior Court issued a temporary restraining order for the sole purpose of extending the date of Joseph's return to his father's residence to August 21, 1992. This order, which was based in part on an August 10, 1992, declaration by Volcani that Joseph was "potentially in imminent and/or immediate risk for psychological and/or physical danger if returned to his father's home in Pennsylvania," stated the court did not assume jurisdiction for any other purpose and the order was to expire on August 21, 1992. Subsequently, on August 18, 1992, the Department filed the instant petition in San Diego County Juvenile Court.
On August 19, 1992, the juvenile court ordered Joseph detained with his mother and any contact between Joseph and Mark was to be arranged through Volcani.
Also, on August 19, 1992, contempt proceedings were filed against Anna in the Court of Common Pleas of Erie County, Pennsylvania, for failure to *685 return Joseph to Pennsylvania. The Pennsylvania court ordered Joseph returned to Pennsylvania by the evening of August 23, 1992. Subsequently, on September 21, 1992, the court continued the contempt matter until resolution of the issue of jurisdiction in California.
On August 27, 1992, Mark appeared in juvenile court in San Diego and entered a denial on the petition. The juvenile court referee stated he recognized that under the Uniform Act and the federal Parental Kidnapping Prevention Act, California must give full faith and credit to the Pennsylvania custody order and announced his intent to do so. The referee noted that the juvenile court only could act and have jurisdiction to act on a temporary basis, based upon a finding that an emergency existed. The referee then found that an emergency existed. The referee ordered supervised visitation for Mark with Joseph in the presence of Volcani so long as Volcani concurred that such visitation would be therapeutically beneficial to Joseph. The referee preauthorized contact by phone and mail within the visitation plan if recommended by Volcani. The parties agreed the referee should contact Judge Fred Anthony, a dependency judge of the Juvenile Division in Pennsylvania.
When the juvenile court referee attempted to telephone Judge Anthony, the judge was on the bench. The referee spoke with Judge Anthony's clerk, who relayed the following information: the Pennsylvania juvenile court viewed the case as a family court matter rather than a dependency matter, and Judge Anthony would be willing to discuss the matter further if the San Diego Juvenile Court acquired jurisdiction and wished the assistance of the dependency court in Pennsylvania.
The trial on the petition was begun on October 23, 1992, and continued on November 9 and 10, 1992, and December 2, 10, 11, and 21, 1992. On December 21, 1992, the juvenile court made a true finding on an allegation that Joseph had been sexually abused by David and dismissed an allegation that Joseph had been sexually abused by Mark. The court also found strong evidence justifying emergency jurisdiction based on Volcani's expert testimony that Joseph suffered from posttraumatic stress disorder and Joseph associated Mark's home as the "very stressor that has caused him such emotional pain." Joseph was ordered to remain detained with Anna pending the dispositional hearing set for January 7, 1993.
At a contested dispositional trial on March 5, 1993, Volcani testified that returning Joseph to his father at this time "would be unbelievably traumatic" and entail "repercussions I believe would be lifelong for Joseph." In describing Joseph's relationship with Mark, Volcani testified Joseph "feels betrayed *686 and violated and is ultimately very fearful of his father." Notwithstanding the trial court's dismissal of the allegation that Mark sexually abused Joseph, Volcani testified that "Joseph's perspective is that his father and stepmother violated him in addition to his stepbrother." The Department social worker also testified that Joseph had told him that morning he did not want to return to Pennsylvania even though David was no longer living with Mark.
At the conclusion of the dispositional trial, the juvenile court found the minor could not safely be returned to Mark's home. The court noted that Joseph did not want to return there. The court found beyond a reasonable doubt that an emergency did exist and declared Joseph a dependent of the San Diego County Juvenile Court. Physical custody was removed from the father and reunification services were ordered. Joseph's placement with Anna was continued. The juvenile court authorized contact between Joseph and Mark and other family members in Pennsylvania under conditions set by Volcani if the psychologist determined that such contact was therapeutically appropriate.

DISCUSSION

I
(1a) As we understand Mark's argument, he contends the juvenile court in San Diego lacked jurisdiction to conduct the dependency proceeding under the Uniform Act. The contention is without merit.
(2) We begin with an overview of the Uniform Act, which is the exclusive method of determining subject matter jurisdiction in California custody cases. (People v. Beach (1987) 194 Cal. App.3d 955, 963 [240 Cal. Rptr. 50].) The Uniform Act applies to dependency proceedings, which are included in the definition of "custody proceeding" for purposes of the act. (§ 5151, subd. (3).)[2]
In Kumar v. Superior Court (1982) 32 Cal.3d 689, 695 [186 Cal. Rptr. 772, 652 P.2d 1003], our Supreme Court observed the Uniform Act "was promulgated for the stated purposes of avoiding jurisdictional competition and conflict, promoting interstate cooperation, litigating custody where child and family have closest connections, discouraging continuing conflict over custody, deterring abductions and unilateral removals of children, avoiding *687 relitigation of another state's custody decisions, and promoting exchange of information and other mutual assistance between courts of sister states. (Uniform Act, § 1; § 5150.)" (Fn. omitted.) In Beach, supra, 194 Cal. App.3d 955, 968, this court noted the Uniform Act "was enacted in response to concern over the shifting of children from state to state in custody battles as courts permitted `custody claimants to sue in the courts of almost any state, no matter how fleeting the contact of the child and family was with the particular state, with little regard to any conflict of law rules.' ([Quoting] 9 West's U. Laws Ann. (1979), comrs. note, p. 112....) As a result of this state of affairs, with courts freely modifying custody orders and granting custody to whoever currently had possession of the child, parents were encouraged to resort to self-help and child-stealing to the child's detriment.
"The [Uniform Act] seeks to promote the best interest of the child by giving greater stability to custody decrees through limiting jurisdiction to decide custody matters and enabling courts `to arrive at a fully informed judgment which transcends state lines and considers all claimants, residents and non-residents, on an equal basis and from the standpoint of the welfare of the child.' ([Quoting 9 West's U. Laws Ann. (1979) Child Custody Jurisdiction Act, Comrs. note,] p. 114....)" (Fn. omitted.)
The jurisdictional grounds for making a child custody determination under the act (Uniform Act, § 3) are codified in California in section 5152. Sections that follow address the parties' due process rights and prescribe appropriate procedures. (See, e.g., §§ 5153-5154, 5168.) Other sections address the circumstances or situations in which the courts may or should decline to exercise jurisdiction. (See, e.g., §§ 5156-5167.)
The Uniform Act envisions a multistep process which begins with a court determining whether it has jurisdiction. (Beach, supra, 194 Cal. App.3d 955, 963.) "The jurisdictional determination is a `vitally important preliminary decision.' [Citation]." (Ibid.)
(1b) Here, the trial court found it had jurisdiction under section 5152, subdivision (a)(3)(B), which states:
"(a) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if the conditions as set forth in any of the following paragraphs are met:
".... .... .... .... .... .... ....
*688 "(3) The child is physically present in this state and ... (B) it is necessary in an emergency to protect the child because he or she has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent...."
Invocation of emergency jurisdiction under the Uniform Act is reserved for extraordinary circumstances. As the commissioners who drafted the Uniform Act commented, the emergency provision "retains and reaffirms parens patriae jurisdiction, usually exercised by a juvenile court, which a state must assume when a child is in a situation requiring immediate protection. This jurisdiction exists when a child has been abandoned and in emergency cases of child neglect. Presence of the child in the state is the only prerequisite. This extraordinary jurisdiction is reserved for extraordinary circumstances. [Citation.] When there is child neglect without emergency or abandonment, jurisdiction cannot be based on this paragraph." (9 West's U. Laws Ann. (1988 ed.) Child Custody Jurisdiction Act, § 3, Comrs. note, p. 145.)
In Hache v. Riley (1982) 186 N.J. Super. 119 [451 A.2d 971, 975], a New Jersey court considered the propriety of a California court assuming emergency jurisdiction and observed that when the potential for immediate harm is presented emergency jurisdiction will lie: "In a situation where the validity of allegations related to abandonment and/or neglect of children is uncertain, the very possibility that the allegations of immediate harm might be true is sufficient for a court to assume emergency jurisdiction in the best interests of the children under the [Uniform Act]. States have a parens patriae duty to children within their borders which should not be abdicated; even broad allegations that an emergency exists should be given due consideration."
Mark's claim there was insufficient evidence to invoke emergency jurisdiction is simply not a credible argument. Here, there was a sworn declaration by a psychologist known to the court that Joseph was "potentially in imminent and/or immediate risk for psychological and/or physical danger if returned to his father's home in Pennsylvania." Furthermore, this declaration was based upon newly reported instances of purported abuse by stepbrother David as well as reported instances of purported abuse by new perpetrators, namely Mark and his wife. Thus, Mark also is wrong when he argues the allegations had already been litigated in Pennsylvania.
When a petition contains allegations of an emergency situation, a court may properly issue an interim custody order to protect the child pending a *689 hearing. (Beach, supra, 194 Cal. App.3d 955, 970; see also Cole v. Superior Court (1985) 173 Cal. App.3d 265 [218 Cal. Rptr. 905].) Given the declaration of Volcani and the allegations of the petition, we deem it was proper for the juvenile court in San Diego to assume emergency jurisdiction under the Uniform Act.
Was it proper for the juvenile court to proceed with the jurisdictional hearing, which began on October 23, 1992, and encompassed several days of testimony, concluding on December 21, 1992? We recognize there is a lack of uniformity among the states on what type of hearing to conduct to ascertain if an emergency exists under the Uniform Act. (See Donigan, Child Custody Jurisdiction: New Legislation Reflects Public Policy Against Parental Abduction (1983-84) 19 Gonzaga L.Rev. 1, 57-59.) The court in Marcrum v. Marcrum (1981) 181 N.J. Super. 361 [437 A.2d 725, 727-728], held a plenary hearing should be conducted to weigh all the evidence bearing on the alleged mistreatment or abuse of the children. "New Jersey must not abdicate it [sic] parens patriae duty to these children." (Id. at p. 728; but compare State in Interest of D.S.K. (1990) 133 Utah 14 [792 P.2d 118, 127] ["temporary order should continue only as long as necessary to contact the decree state and determine which court is the correct forum to handle the emergency abuse or neglect claim and to litigate the modification issue"].)
Given the circumstances presented here, we find it was proper for the juvenile court to conduct a plenary hearing to determine if an emergency existed. A court's determination of its jurisdiction "should not be made `in a rush to judgment' but rather `after a full and fair evidentiary hearing.'" (Beach, supra, 194 Cal. App.3d 955, 963, quoting Cole, supra, 173 Cal. App.3d 265, 272.)

II
(3) As we understand Mark's alternative argument, Mark contends that even if an emergency existed and invocation of emergency jurisdiction under the Uniform Act was warranted, the case should have been returned to Pennsylvania after the jurisdictional hearing was completed. In other words, Mark contends the juvenile court's retention of the case under a continuing emergency jurisdiction theory was improper under the Uniform Act. We *690 believe this contention has merit to the extent it raises the future jurisdictional implications of an exercise of emergency jurisdiction under the Uniform Act.[3]
At the outset, we note that our research has not disclosed any reported California cases that deal with the issue of how long a court should continue its emergency jurisdiction under the Uniform Act. However, the temporal nature of emergency jurisdiction is clear from case law from other states and from the legal literature.
For example, Professor Brodenheimer, reporter for the special committee that drafted the Uniform Act, in commenting on the scope of jurisdiction a court should exercise under the emergency provision, wrote: "[T]his special power to take protective measures does not encompass jurisdiction to make permanent custody determinations or to modify the custody decree of a court with continuing jurisdiction. Emergency jurisdiction confers authority to make temporary orders, including temporary custody for a limited period of time, pending proceedings in the state with regular jurisdiction under the Act." (Bodenheimer, Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA (1981) 14 Fam.L.Q. 203, 225-226.
As the New Jersey court in Hache, supra, 451 A.2d 971, 975, observed: "[E]xercise of jurisdiction under the `abandonment' and `emergency' provisions of the UCCJA does not take on the same characteristics or implications as the exercise of jurisdiction under the other provisions of the act. Assumption of emergency jurisdiction is an assumption of temporary jurisdiction only; it is meant solely to prevent irreparable and immediate harm to children and, absent satisfaction of other UCCJA jurisdictional prerequisites, does not confer upon the state exercising emergency jurisdiction the authority to make a permanent custody disposition."
In Nelson v. Nelson (Fla. Dist. Ct. App. 1983) 433 So.2d 1015, 1019, the appellate court stated: "Where a Florida court is presented with substantial evidence of imminent physical or emotional danger to the child upon the *691 child's return to the custodial parent, it is, under the doctrine of parens patriae, empowered to issue a temporary protective order which will preserve the status quo for such limited time as is required to permit the petitioner to apply for a change of permanent custody to the state which has jurisdiction over such a petition under the provisions of the Uniform Child Custody Jurisdiction Act."
Here, as we have noted above, the juvenile court, recognizing there was a legitimate protective issue, properly invoked emergency jurisdiction under the Uniform Act and properly conducted a thorough hearing on the serious allegations of the petition. At the conclusion of that hearing, the petition was sustained on the basis of a true finding on the allegation involving stepbrother David, the direct allegation against Mark being dismissed. It is at this point that we question the procedure followed by the juvenile court: continuing its emergency jurisdiction and proceeding with a dispositional hearing under Welfare and Institutions Code section 358. In so doing, the juvenile court in effect handled the case as though it were a typical dependency proceeding without the ramifications of being an interstate custody matter that comes under the Uniform Act.
As characterized by the drafters of the Uniform Act, emergency jurisdiction is an "extraordinary jurisdiction ... reserved for extraordinary circumstances." (9 West's U. Laws Ann., supra, Child Custody Jurisdiction Act, § 3, Comrs. note, p. 145.) It was not contemplated to be a vehicle for a state to attain modification jurisdiction on an ongoing basis or for an indefinite period of time.[4] That, however, is what in effect appears to have happened here  notwithstanding the juvenile court referee's repeated comments that he was not modifying the Pennsylvania custody order. By the time the briefing on this appeal had been completed, nearly 11 months had passed since the juvenile court first found an emergency; now, the emergency has stretched well beyond a year. Such a situation is not in keeping with the temporal nature of emergency judisiction as envisioned by the drafters of the Uniform Act, and we can find nothing in California law to justify treating emergency jurisdiction as something more than a short-term, limited jurisdiction.
The notion of temporary jurisdiction was recognized in Matter of Pima County Juvenile Action (1985) 147 Ariz. 527 [711 P.2d 1200], modified, *692 Matter of Appeal in Pima County (1986) 147 Ariz. 584 [712 P.2d 431], involving children who were placed in the custody of guardians in Arkansas after their parents had died in an automobile accident. The children's grandfather initiated dependency proceedings in Arizona, alleging sexual abuse by a friend of the guardians and severe disciplinary practices amounting to cruelty by the guardians. The juvenile court in Arizona entered temporary orders making the children temporary wards of the court, awarding temporary legal custody to the Department of Economic Security and granting temporary physical custody to the grandfather. The guardians appealed, claiming the court did not have jurisdiction under the Uniform Act. The appellate court held the juvenile court had properly assumed emergency jurisdiction; however, the court noted that Arkansas had retained continuing jurisdiction through the guardian proceeding, and the record did not support a finding that Arkansas had declined jurisdiction. Therefore, the Arizona court had jurisdiction to grant temporary orders only. "In proceeding to exercise [its emergency] jurisdiction without first communicating with the courts of Arkansas to determine the appropriate forum and without the latter's having declined jurisdiction, the juvenile court acted in contravention of ... the Uniform Act...." (Matter of Pima Juvenile Action, supra, 711 P.2d 1200, 1207; accord, In re Interest of L.W. (1992) 241 Neb. 84 [486 N.W.2d 486]; Garza v. Harney (Tex. Ct. App. 1987) 726 S.W.2d 198.)
The Department argues, however, the emergency jurisdiction under the Uniform Act continues as long as the dependency exists, and since Joseph continues to be at risk of emotional harm, the emergency jurisdiction should continue. We disagree, adopting the reasoning of the Arizona Court of Appeals, which said: "To adopt the construction of the Uniform Act urged by [the Department of Economic Security] would have the effect as a practical matter of excluding all dependency proceedings from its purview, a result clearly not intended by the drafters, who expressly defined custody proceedings to include dependency proceedings. [Citation.] Nor do we believe that [the Department of Economic Security's] statutory duty to protect the children can only be fulfilled by conducting the dependency proceeding in Arizona." (Matter of Pima County Juvenile Action, supra, 711 P.2d 1200, 1207.) We have no reason to believe that the State of Pennsylvania would be unwilling or unable to exercise its own parens patriae duty to protect its resident children; certainly, the juvenile court, in communicating with the Pennsylvania court, can apprise the latter that the allegations raised in the San Diego petition were new ones, which were not previously investigated by authorities in Pennsylvania, as well as relate the evidence presented concerning the risk of emotional harm to Joseph if he were returned to Mark's home. Under the Uniform Act, Pennsylvania, unless it declines jurisdiction, has primary jurisdiction; we are confident that the *693 "cooperation between courts of different states" that is the hallmark of the Uniform Act "will lead to an informed decision on custody." (Fry v. Ball (1975) 190 Colo. 128 [544 P.2d 402, 407].)[5] "The courts of the home state of the child are equally well suited to remedy the ills which result from alleged parental abuse or neglect." (Roberts v. District Court of Larimer Cty. (1979) 198 Colo. 79 [596 P.2d 65, 68].) The purposes of the Uniform Act should not be "emasculated by a provincial or limited view of the spirit or purpose of the act." (Ibid.)
What, then, should the juvenile court have done, particularly in light of the substantial evidence that Joseph's emotional well-being remained at risk? First, after the juvenile court sustained the petition, it should have contacted the Court of Common Pleas of Erie County, Pennsylvania, which issued the original custody decree, informed that court of its findings and deferred jurisdiction to that court. "The resolution of jurisdictional conflict between two states by direct interstate judicial communication and consultation is not discretionary; it is mandatory." (Guardianship of Donaldson (1986) 178 Cal. App.3d 477, 491 [223 Cal. Rptr. 707].) Having resolved the merits of the petition, the juvenile court in San Diego should have communicated directly with the Court of Common Pleas and initiated procedures for a reexamination of the custody issues in that court; the failure to do so was not consistent with the Uniform Act, which (1) requires a court to communicate with a court in another state that has a simultaneous or pending proceeding in the matter (see § 5155), and (2) incorporates an interstate information scheme to facilitate cooperation among states and to avoid jurisdictional conflict (see §§ 5168-5171). From our reading of the record, it does not appear that the juvenile court in San Diego ever directly contacted the Court of Common Pleas.[6] We are aware that when the juvenile court in San Diego telephoned a juvenile court judge in Pennsylvania, the Pennsylvania judge, who was on the bench at the time, did not take a recess to take the phone call, but rather had his clerk relay the message that the case was viewed in Pennsylvania as a family court matter rather than a dependency matter. Regardless of the manner in which the Pennsylvania judge handled the phone call it was not an abdication of Pennsylvania's continuing jurisdiction in this matter. In fact, the Court of Common Pleas, which is the *694 relevant Pennsylvania court, affirmatively has not abdicated its jurisdiction. An order dated September 23, 1992, decreed, in part, "Jurisdiction of the aforementioned child and this matter shall remain in the Court of Common Pleas of Erie County, Pennsylvania unless and until jurisdiction would change under the Uniform Child Custody Jurisdiction Act."
Accordingly, the juvenile court is ordered to stay the judgment of dependency, and all orders issued in conjunction with that judgment and subsequent to it are hereby vacated. The juvenile court is directed to communicate with the Court of Common Pleas of Erie County, Pennsylvania, and inform it of its findings with respect to the dependency proceeding in an effort to determine the most appropriate forum to litigate this matter. On remand, if the juvenile court finds it is necessary in the best interest of Joseph in light of the concern for the welfare of Joseph engendered by Volcani's expert testimony, the juvenile court may issue a temporary order maintaining custody in Anna for a period of time no longer than reasonably necessary to allow Anna to present her allegations of potential harm to Joseph to the proper Pennsylvania court. While such a temporary order is not strictly within the parameters of the Uniform Act, we find it would be authorized under the equity powers of the juvenile court. (See Nussbaumer v. Nussbaumer (Fla. Dist. Ct. App. 1983) 442 So.2d 1094, 1098; Fry v. Ball, supra, 544 P.2d 402, 408; Zillmer v. Zillmer (1960) 8 Wis.2d 657 [100 N.W.2d 564], modified 8 Wis.2d 663a [101 N.W.2d 703] [a pre-Uniform Act decision]; see also Bodenheimer, Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modifications (1977) 65 Cal.L.Rev. 978, 990-992 and Note, Temporary Custody Under the Uniform Child Custody Jurisdiction Act: Influence Without Modification (1977) 48 U.Colo.L.Rev. 603, 610, 612-615 [lauding Fry and Zillmer as ingenious cooperative schemes in accord with the spirit of the Uniform Act].)

DISPOSITION[7]
The judgment of dependency is affirmed but ordered stayed. All orders made subsequent to that judgment are vacated. The juvenile court is directed to communicate with the Court of Common Pleas of Erie County, Pennsylvania, in accordance with the Uniform Act and the views expressed above. On remand, the juvenile court may exercise its powers of equity to place Joseph in the temporary custody of Anna pending reinstitution of proceedings in Pennsylvania in accordance with the views expressed above. In the *695 unlikely event that the State of Pennsylvania declines jurisdiction in favor of California, the stay of the judgment shall be lifted and the orders made subsequent to that judgment shall be reinstated.
Benke, J., and Nares, J., concurred.
A petition for a rehearing was denied November 10, 1993, and petitioner's application for review by the Supreme Court was denied January 20, 1994.
NOTES
[1] The Uniform Act is contained in Civil Code sections 5150-5174, and, unless otherwise indicated, statutory references are to the Civil Code. The Uniform Act was incorporated into the California Civil Code as title 9 in 1973. It has been adopted by all 50 states and the District of Columbia. (9 West's Ann. Civ. Code (1993 pocket supp.) pp. 44-45.) The Uniform Act was adopted by Pennsylvania effective 1977. (Wolf v. Weymers (1981) 285 Pa.Super. 361 [427 A.2d 678]; 23 Pa. Cons. Stat. §§ 5341-5366.)
[2] Accordingly, the Department's reliance on cases such as In re Benjamin D. (1991) 227 Cal. App.3d 1464 [278 Cal. Rptr. 468], In re Travis C. (1991) 233 Cal. App.3d 492 [284 Cal. Rptr. 469] and In re Desiree B. (1992) 8 Cal. App.4th 286 [10 Cal. Rptr.2d 254], which deal with intrastate custody disputes, is misplaced. This case is not about the competing jurisdictions between a family court of California and a juvenile court of California.
[3] We emphasize, however, we are not endorsing Mark's position to the extent he argues that the circumstances that led to a proper invocation of emergency jurisdiction have been eliminated. The record clearly indicates that Joseph's emotional well-being is still at issue; notwithstanding the juvenile court's finding that Mark did not molest Joseph and the fact that David no longer resides in Mark's home, substantial evidence was presented that Joseph was at risk for serious emotional or psychological harm at that time if returned to Mark. We are in no way minimizing the significance of such risk of emotional harm, which in itself could justify emergency jurisdiction. Here, however, we are concerned with the temporal nature of emergency jurisdiction under the Uniform Act.
[4] Indeed, California does not have concurrent jurisdiction with another state's court to modify a custody decree. (Kumar, supra, 32 Cal.3d 689, 699.) Section 5163 provides in pertinent part: "(1) If a court of another state has made a custody decree, a court of this state shall not modify that decree unless (a) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this title or has declined to assume jurisdiction to modify the decree and (b) the court of this state has jurisdiction."
[5] In that regard, we note the Uniform Act incorporates procedures to mitigate the difficulty an out-of-state litigant may have in producing evidence. Anna may present evidence by deposition. (§ 5166.) Also, records and transcripts of prior hearings may be forwarded to the Pennsylvania court. (§§ 5170, 5171.) Additionally, if the Pennsylvania court so requests, a court of this state may hold an evidentiary hearing and forward transcripts of the hearing to the Pennsylvania court. (§ 5168.)
[6] We can conclude, however, the Court of Common Pleas apparently has knowledge of the proceedings in San Diego since the record contains a September 21, 1992, order issued by that court continuing the matter of Anna's contempt "until resolution of the issue of jurisdiction of the state of California."
[7] In light of our disposition, it is unnecessary to address Mark's remaining assignments of error.