[No. G027548. Fourth Dist., Div. Three. May 10, 2001.]

In re NADA R. et al., Persons Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
ABDULAZIZ R., Defendant and Appellant;
MARIA G., Defendant and Respondent.

[No. G027698. Fourth Dist., Div. Three. May 10, 2001.]

ABDULAZIZ R., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties
in Interest.

## Counsel

Sheryl Edgar and John L. Dodd for Defendant and Appellant and for Petitioner.

Laurence M. Watson, County Counsel, and Mark R. Howe, Deputy County Counsel, for Plaintiff and Respondent and for Real Party in Interest Orange County Social Services Agency.

Cynthia Loo Haffner for Defendant and Respondent and for Real Party in Interest Maria G.

Michael D. Randall, under appointment by the Court of Appeal, for Minors.

## Opinion

**BEDSWORTH, J.**—On May 24, 2000, the Orange County Juvenile Court declared Nada R. and Reema R. dependents and placed them in the physical custody of their mother, Maria G. Father Abdulaziz R. petitioned for a writ of habeas corpus and also appeals the judgment. Both have been consolidated for review.[1] He argues (1) the juvenile court lacked subject matter jurisdiction, (2) certain evidentiary rulings deprived him of due process, (3)

---

[1]Since both cases have been consolidated for review, we do not address whether a writ of habeas corpus was an appropriate legal remedy available to Abdulaziz.

there was insufficient evidence to sustain allegations he failed to protect Nada from sexual abuse, (4) he was improperly denied reunification services, and finally (5) he is entitled to attorney fees. We find merit in none of these contentions as presented, but our record on one is inadequate and requires that we reverse and remand as to that contention.

Abdulaziz, a Saudi Arabian citizen, and Maria, a permanent United States resident, were married in Washington on April 24, 1984. Their daughter Nada was born in early 1989, in California. Meanwhile, Abdulaziz returned to Saudi Arabia to work after completing his college degree. Maria and Nada moved to Saudi Arabia to join him in late 1992. In late 1993, a second daughter, Reema, was born.

In August of 1995, Maria moved to Orange County alone. Abdulaziz unilaterally obtained a divorce and was awarded custody of both children from the Al-Khobar Supreme Court, Kingdom of Saudi Arabia. Maria was not sent notice of either decree until after Abdulaziz obtained them. In 1996, Maria remarried in Orange County. Thereafter, she had limited contact with Nada and Reema; occasional phone calls and each year, one 2-week visit to Dubai, United Arab Emirates.

On March 9, 2000, Abdulaziz took Nada and Reema to Orlando, Florida for a vacation and Maria joined them. On March 19, Abdulaziz and Maria argued. After Nada sided with her mother, Abdulaziz got extremely angry and began to punch Nada. As Nada attempted to get away from him, he grabbed and clawed her back. Then, he grabbed her and forcibly threw her on the bed. Maria ran into the adjoining room to call the police, and they arrived shortly thereafter. The police officers observed fresh injuries on Nada and arrested Abdulaziz. Maria returned to Orange County with Nada and Reema on March 20, and filed for a restraining order against Abdulaziz based on the Orlando incident.

The allegations in the petition for the restraining order alerted the Orange County Social Services Agency (SSA). On April 7, Nada and Reema were taken into protective custody by SSA and were later released into Maria's care. SSA filed a dependency case on both children pursuant to Welfare and Institutions Code section 300.[2]

In preparation for the initial hearing on April 12, SSA interviewed Nada. She claimed to be afraid of her father and wanted to stay with her mom. She also said her father drank daily and would drive with her and Reema in the

---

[2]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

car while intoxicated. She said she remembered that when she was five years old, her father gave her a loaded handgun to hold to her sleeping mother's head. Nada described the Orlando incident as Maria had reported it and added that when her father threw her on the bed, he choked her. She also told the social worker she would kill herself if returned to her father's care.

Reema confirmed her father drank a lot and would drive them around. She also stated that when she was a baby, her father gave her a gun to hold. In addition, Reema reported she saw her father choke Nada in Orlando and said she was afraid of her father.

Sometime in late April, Nada revealed to her mother that "her driver in Saudi Arabia" sexually abused her. Maria contacted SSA and Nada was later interviewed by the Child Abuse Services Team (CAST). During the interview, Nada revealed that not only did the family driver abuse her, but her uncle's driver and her 15-year-old cousin Aziz also abused her.

At the hearing on May 3, the court denied Abdulaziz's motion challenging its jurisdiction over this case. The court also denied Abdulaziz's request to have witnesses from Saudi Arabia testify telephonically, but agreed to continue the case to allow him to conduct discovery on the added sexual abuse allegations.

At a hearing on May 17, the social worker testified he believed Abdulaziz had an alcohol problem due to his arrest history, Maria's description of their relationship, and statements made by both children. As for the Orlando incident, he believed Abdulaziz became angry with Nada, grabbed her by the back and scratched her. The social worker did not believe there was sufficient evidence to support the sexual abuse allegations as Nada described them and because the physical examination of Nada could neither confirm nor negate the sexual abuse. However, he did indicate he believed Nada had been inappropriately touched by her uncle's driver when she was five years old. The CAST interview tape of Nada was played for the court. Maria testified she left her children in Saudi Arabia because she believed she could not obtain an exit visa for them. She had never seen Abdulaziz physically hurt either child, but claimed that he hit her on many occasions. In fact, Abdulaziz had previously been arrested following physical altercations involving alcohol with her in Palm Springs, California and Fort Lauderdale, Florida. While living in Saudi Arabia, she remembered waking up to find five-year-old Nada holding a gun to her head. She also saw a drunk Abdulaziz hand a loaded gun to Reema to play with when she was only 18 months old and remembered an incident when Abdulaziz fell down some

stairs while carrying Reema when he was intoxicated. She feared she would never see the children again if Abdulaziz resumed physical custody.

Abdulaziz testified he never physically assaulted Maria or either of his daughters. He explained his arrest in Fort Lauderdale occurred after he attempted to pull Maria into the water to go swimming because she had been drinking too much. As for the Orlando incident, Abdulaziz claimed he had been comforting Nada who was upset about her mother leaving the following day. Maria angrily left the room, called the police, and claimed he hurt Nada. Abdulaziz explained that the injuries on Nada's back were from swimming pool slides and the Disney World and Universal Studios rides.

Abdulaziz admitted he owned a gun, but said he had only fired it once or twice while out in the desert. He denied shooting the gun anywhere near the home or giving the gun to either of his daughters. He also denied having an alcohol problem and explained that alcohol was illegal in Saudi Arabia with harsh penalties. Abdulaziz denied driving while intoxicated. He proffered the testimony of an expert on Islamic matrimonial law to "enlighten the court as to what the rights of women are in abusive situations." The court denied his request to have the expert testify.

After considering all the evidence, the court sustained the allegations of the petitions and declared the children dependents of the court. The court placed both Nada and Reema in their mother's care under the court's supervision. A six-month review hearing was set for November 16, 2000. Abdulaziz filed his notice of appeal on June 29, 2000, and his writ August 1, 2000.

I

Abdulaziz argues the Orange County Juvenile Court lacked jurisdiction to conduct a dependency proceeding pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). (Fam. Code, § 3400 et seq.) We disagree.

California adopted the UCCJEA, formerly UCCJA, in January of 2000. This uniform act is the exclusive method of determining the proper forum in custody disputes involving other jurisdictions. (Fam. Code, §§ 3421, 3424, subd. (a); *In re Stephanie M.* (1994) 7 Cal.4th 295, 310 [27 Cal.Rptr.2d 595, 867 P.2d 706].) The UCCJEA also governs juvenile dependency proceedings as well as actions to terminate parental rights. (Fam. Code, § 3402, subd.

(c).) There are different circumstances under which our courts are vested with jurisdiction to make a custody determination under Family Code section 3421. Abdulaziz contends, and we agree, these prerequisites are not satisfied. However, the Orange County court has jurisdiction pursuant to other grounds codified in Family Code section 3424.

■ A court may exercise emergency jurisdiction when a "child is present in this state and . . . it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to, or threatened with, mistreatment or abuse." (Fam. Code, § 3424, subd. (a).) The courts have interpreted "emergency" as a situation in which a child is in immediate risk of danger if returned to a parent's care. (See *In re Stephanie M., supra,* 7 Cal.4th 295 [court asserted emergency jurisdiction over an abused child diagnosed as suffering from battered child syndrome]; *In re Joseph D.* (1993) 19 Cal.App.4th 678 [23 Cal.Rptr.2d 574] [emergency jurisdiction was proper based on reported incidents involving sexual abuse by child's stepbrother and father].) Aside from the necessity of protecting a child from immediate harm, presence of the child in the state is the only prerequisite. (19 Cal.4th at p. 688.)

Here, there certainly was enough evidence for the court to assert emergency jurisdiction. On March 19, Abdulaziz was arrested in Orlando for physically assaulting Nada. Upon investigation, SSA discovered he had been arrested on two prior occasions due to physical altercations involving alcohol with Maria. In her interviews with SSA, Nada remembered her father gave her a loaded gun to put to her sleeping mother's head when she was only five years old. She claimed he drank "all the time" and drove with her and Reema in the car while intoxicated. Reema confirmed Nada's statements. Later, Nada revealed that while she was living with Abdulaziz, she was sexually molested by the family's driver, her uncle's driver, and her cousin. In cases where the validity of the allegations are uncertain, the very possibility the allegations of immediate harm might be true is sufficient for the court to assume emergency jurisdiction in the best interests of the children. (*In re Joseph D., supra,* 19 Cal.App.4th at p. 688.) Accordingly, the juvenile court properly asserted emergency jurisdiction.

Abdulaziz argues that even if the juvenile court initially had emergency jurisdiction, there was no continuing emergency justifying continuing jurisdiction. He cites *In re Joseph D., supra,* 19 Cal.App.4th 678, to support this contention. In that case, the court recognized that without satisfying other UCCJA jurisdictional prerequisites, the act does not confer upon the state exercising emergency jurisdiction the power to make permanent custody

determinations. (*Id.* at p. 689.) Assumption of emergency jurisdiction is an assumption of temporary jurisdiction only. (*Id.* at p. 691.) Therefore, while the court properly exercised jurisdiction when it conducted a plenary hearing to determine whether an emergency existed, an emergency is not necessarily coextensive with the dependency. (*Id.* at p. 692.)

We agree that emergency jurisdiction is short-term and limited. However, we cannot agree that a court may not exercise emergency jurisdiction after the plenary hearing. In *In re Stephanie M., supra,* 7 Cal.4th 295, our Supreme Court found that the juvenile court had continuing jurisdiction over the minor pursuant to the Family Code section providing for emergency jurisdiction. While the court did not squarely overrule *In re Joseph D., supra,* 19 Cal.App.4th 678, it did uphold "continuing jurisdiction because of the emergency presented by the abuse of the child, and the impossibility of returning her immediately to her parents." (*In re Stephanie M., supra,* 7 Cal.4th at p. 312.) This ruling suggests that an emergency can exist so long as the reasons underlying the dependency exist.

In this case, the court found by clear and convincing evidence that returning the children to Abdulaziz would place them at substantial risk of harm. No subsequent facts suggest that risk is no longer present. If the risk of harm creating the emergency is ongoing, then the court should be afforded jurisdiction to prevent such harm. That appears to be the case here.

■ Abdulaziz next argues the trial court improperly entered a disposition order because it failed to communicate with Saudi Arabian court. Family Code section 3424, subdivision (d) requires the court asserting emergency jurisdiction to communicate immediately with the court where a child custody determination has been made. (*In re Joseph D., supra,* 19 Cal.App.4th at pp. 692-693.) Abdulaziz contends that since the juvenile court failed to communicate with the Saudi Arabian court when it received notice of the custody decree, its order should be vacated.

However, Maria points out that the juvenile court was not required to communicate with the Saudi Arabian court in the absence of proof that the Saudi Arabian custody determination is enforceable under Family Code section 3424, subdivision (d). She contends the custody decree is not enforceable because she did not receive fair notice or opportunity to contest the hearing. Therefore, she argues the lower court did not assert jurisdiction in the face of an enforceable competing family custody order and was under no obligation to communicate.

The record is unclear whether the juvenile court attempted to communicate with the Saudi Arabian court at any time before or after the jurisdictional hearing. Nor can we assess from the facts provided whether the Saudi Arabian custody decree is enforceable pursuant to Family Code section 3424, subdivision (d). Therefore, we remand to the juvenile court to adjudicate these issues to determine whether Orange County may assert continuing jurisdiction without communicating with the Saudi Arabia court. Until then, we shall treat the determination made by the juvenile court as a temporary order, to remain in effect until a final determination is made.

## II

Abdulaziz contends that certain evidentiary rulings by the trial court denied him due process. Specifically, he complains of two rulings: (1) the trial court's refusal to allow witnesses to testify telephonically from Saudi Arabia, and (2) the trial court's refusal to allow an expert on Islamic matrimonial law to testify "as to the rights of women in abusive situations." We reject both contentions.

We agree with Abdulaziz's assertion that the United States Constitution guarantees "a meaningful opportunity to present a complete defense." (*California v. Trombetta* (1984) 467 U.S. 479, 485 [104 S.Ct. 2528, 2532, 81 L.Ed.2d 413].) ■ However, in dependency proceedings, a parent's right to due process is limited by the need to balance the "interest in regaining custody of the minors against the state's desire to conclude dependency matters expeditiously and . . . exercise broad control over the proceedings . . . ." (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 759-760 [89 Cal.Rptr.2d 407].) Trial courts are afforded discretion to work within existing guidelines to determine the admissibility of evidence. (See *Wagner v. Benson* (1980) 101 Cal.App.3d 27, 36 [161 Cal.Rptr. 516].) The reviewing court will not disturb their findings absent an " ' " 'arbitrary, capricious, or patently absurd determination. . . .' " ' " (*In re Raymundo B.* (1988) 203 Cal.App.3d 1447, 1456 [250 Cal.Rptr. 812].)

■ The trial record reflects that Abdulaziz's counsel misinterpreted the court's ruling as excluding the testimony of the witnesses residing in Saudi Arabia altogether. Actually, the juvenile court expressed concerns about the reliability of telephonic testimony and refused to permit the presentation of the evidence in this format. Following the court's ruling and its subsequent clarification, there were no efforts to present these witnesses. There was no request for a continuance or any other remedy which would have provided live testimony. Since Abdulaziz was not prevented from offering the testimony, but only restricted in the manner of its presentation, we find the court did not abuse its discretion.

■ Regarding the proffered testimony of the expert on Saudi Arabian matrimonial law, such testimony was properly excluded. Abdulaziz argues the expert's testimony was "extremely relevant" to the "determination of the ultimate placement of the children . . . as to what steps the mother has taken historically to protect the children." Evidence Code section 352 affords the court with discretion to exclude evidence that is unduly time consuming in its presentation. Here, the court excluded this evidence because the other parties did not have notice of the expert's testimony and permitting it required a continuance for the parties to prepare to rebut this evidence. Since this expert had no personal knowledge of what specific actions Maria had taken, the court merely balanced the "minimal importance" of this testimony with the state's interest in expeditious resolution of dependency matters and properly exercised its discretion. We see no reason to second-guess this call.

## III

■ Abdulaziz argues there is insufficient evidence to sustain any allegation he failed to protect Nada from sexual abuse. First, he asserts there is insufficient evidence to prove Nada suffered sexual abuse. Further, he argues even if Nada was sexually abused while in his care, there is insufficient evidence to prove that he either knew or reasonably should have known of the sexual abuse, or that he failed to provide appropriate supervision for Nada and placed her at risk of future sexual abuse. We cannot agree.

■ Our role in considering an insufficiency of the evidence claim is quite limited. We do not reassess the credibility of witnesses (*In re Shelley J.* (1998) 68 Cal.App.4th 322, 329 [79 Cal.Rptr.2d 922]), and we review the record in the light most favorable to the findings of the juvenile court (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193 [60 Cal.Rptr.2d 315]), drawing all inferences from the evidence which support the court's determination. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214 [272 Cal.Rptr. 316].) By this process we endeavor to determine whether evidence of reasonable, credible and solid value exists such that a reasonable trier of fact could find as the trial court did. (*In re Laura F.* (1983) 33 Cal.3d 826, 833 [191 Cal.Rptr. 464, 662 P.2d 922].)

■ The court believed Nada's statements made during the CAST interview.[3] In reviewing the tape, we find there is sufficient evidence to persuade a rational trier of fact. Nada described the sexual acts with three

---

[3]"Court: The CAST tape speaks for itself. I don't know how the court could not look at the tape, watch that child take a picture of a girl and a picture of a boy, slap them together, rub them back and forth and not get what that child is talking about. I don't know how the court

different men in detail and was able to tell the interviewer her age when each incident occurred. She told the interviewer her cousin "puts his penis on my front" and demonstrated a rubbing motion with her hands. She also said her cousin put his penis inside her and that it "hurt" her. Nada said the family driver "licks her front" and "puts in fingers inside [her]" and that it hurts her. She also said her uncle's driver had done similar acts to her when she was five years old.

Nada—convincingly—demonstrated her experiences with both pictures and role playing with toys. The trial court was entitled to believe that testimony, and—if believed—it provides sufficient evidence to support the conclusion Nada suffered sexual abuse while in her father's custody.

Similarly, there is sufficient evidence that Abdulaziz failed to protect Nada from sexual abuse. During the CAST interview, Nada said both her cousin and family driver "always" did these acts to her. At times, the abuse occurred on a weekly basis. She also told the interviewer that many of these acts occurred in the family compound during the middle of the day. Abdulaziz did not believe any of the sexual abuse allegations, and claimed he had not heard anything about them. However, Nada said she told her father about her cousin abusing her when she was 10½ years old. She said her father said nothing in response. This was a conflict in testimony properly left to the trier of fact to resolve. The court appeared to find the testimony about Abdulaziz's failure to protect very convincing, and we are unable to find any basis for questioning its judgment.

## IV

Abdulaziz also argues the juvenile court erred in denying him reunification services. He claims the court's order was not supported by substantial evidence and the court failed to make the requisite findings necessary to deny services. Abdulaziz also argues the orders denying him reunification services violated substantive due process of law. Again, we must disagree.

First, we find Abdulaziz did not waive his right to appeal the court order denying him reunification services simply because he did not object at the disposition hearing. Since the juvenile court in this case did not set a section 366.26 hearing when it denied services for Abdulaziz, he is not barred from making this argument. (See *Wanda B. v. Superior Court* (1996)

can watch that child's actions with two bears and how she positioned them and not believe that that child was reliving exactly what happened to her in Saudi Arabia."

41 Cal.App.4th 1391, 1395 [49 Cal.Rptr.2d 175] [if the court does not set a § 366.26 hearing when denying reunification services, those orders may be appealed immediately].)

Notwithstanding, we find the court did not improperly deny Abdulaziz reunification services. He argues the juvenile court's orders were not supported by substantial evidence and he was not afforded notice that reunification services would not be offered as required by section 361.5. However, the denial of reunification services need not be supported by substantial evidence. The juvenile court denied reunification services for Abdulaziz pursuant to section 361.2, subdivision (b)(2.) This statute vests the court with the discretion either to deny or offer reunification services when the children are placed in the physical custody of the formerly noncustodial parent. (§ 361.2, subd. (b)(2); *In re Erika W.* (1994) 28 Cal.App.4th 470, 475 [33 Cal.Rptr.2d 548].) Thus, the standard of review is abuse of discretion, and we find none.

The juvenile court has broad discretion in crafting a disposition pursuant to a child's best interest. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 [57 Cal.Rptr.2d 861].) A reviewing court will not disturb a juvenile court's custody determination unless it " 'exceeded the limits of legal discretion.' " (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421 [159 Cal.Rptr. 460].) Here, there was no such abuse. (*Ibid.*) On the contrary, the court clearly had before it evidence the children would be exposed to the "risk of serious physical, emotional harm if released" to Abdulaziz[4] and found that vesting custody with Maria would be in the children's best interest.

Abdulaziz asserts he is constitutionally entitled to reunification services because the court's order denied him due process. Specifically, he argues he has a fundamental liberty interest in his relationship with both Nada and Reema, and that relationship may not be infringed without providing reunification services. California law does not support his position. A similar argument was rejected in *In re Erika W., supra,* 28 Cal.App.4th 470, and we reject this one for much the same reason we expressed there.

---

[4]"Court: It's very clear that Father's refusal to believe the minors, the refusal to recognize the sexual abuse, the refusal to recognize his alcohol problem that results in mysteriously being placed in custody and doing jail time, and pleading guilty to thing, his refusal to believe in an alcohol problem that results in him driving while intoxicated. His refusal to acknowledge that alcohol problem and resultant domestic violence that seems to bring the police on the scene in this country are all reasons that the court can find by clear and convincing evidence that the child will be exposed to the risk of serious physical, emotional harm if released to the father."

■ Substantive due process prohibits governmental interference with a person's fundamental right to life, liberty or property by unreasonable government action. (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 472-473 [78 Cal.Rptr.2d 110].) A deprivation is permitted only if the government action has a reasonable and substantial relation to the objective sought. (*Ibid.*) The goal of the dependency scheme is to protect abused or neglected children. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826].) We agree a parent has a liberty interest that may not be abrogated absent a compelling state interest. But the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. (*Ibid.*) The state's interest requires the court to focus on the child's placement and well-being, rather than on a parent's custody challenge.

Here, the court determined that Abdulaziz's inability to face his own alcohol problem placed the children at substantial risk of harm. Further, the failure to order reunification services arises from Abdulaziz's own failure to request them, and he has not yet been precluded from requesting them in the future. (See *In re Terry H.* (1994) 27 Cal.App.4th 1847 [34 Cal.Rptr.2d 271] [no due process violation when trial court did not order reunification plan for noncustodial father who failed to request custody of his own children].)

Abdulaziz also complains his trial counsel was constitutionally ineffective when he failed to object to the court orders denying reunification services. ■ The test for ineffective counsel is twofold: (1) counsel's representation falls below an objective standard of reasonableness and (2) the deficiency subjects defendant to demonstrable prejudice. (*People v. Cain* (1995) 10 Cal.4th 1, 28 [40 Cal.Rptr.2d 481, 892 P.2d 1224], citing *Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 2064-2065, 80 L.Ed.2d 674].) A court need not evaluate whether counsel's performance was deficient before examining prejudice suffered by defendant. (*Strickland v. Washington, supra,* 466 U.S. 668, 697 [104 S.Ct. 2052, 2069-2070].) Thus, a court may reject a claim if the party fails to demonstrate that but for trial counsel's failings, the result would have been more favorable to the defendant. (*Id.* at p. 694 [104 S.Ct. at p. 2068].)

Here, the court clearly expressed its intent to have custody vest with Maria in the best interests of the children.[5] The court acted well within its discretion in denying services. Abdulaziz fails to demonstrate the court would

---

[5]"Court: The court finds by clear and convincing evidence that 361.(1), (3), and (4) apply, and to vest custody with the father would be detrimental to the minors, and to vest custody with the mother is required to serve the minors' best interest. The welfare of the minors

have granted him reunification services had his counsel objected at the disposition hearing, and also fails to provide any record upon which we can conclude that at the time of the hearing he *wanted* reunification services. Accordingly, we reject the argument.

## V

Abdulaziz argues he is entitled to attorney fees pursuant to Government Code section 800. He asserts the ruling below is arbitrary and capricious because there is no factual or legal basis for dependency or custody jurisdiction in Orange County. He is wrong factually—as we have discussed—and legally.

Government Code section 800 permits a complainant to collect attorney fees if he or she prevails in a civil action to appeal or review the determination of any administrative proceeding if such determination was a result of arbitrary or capricious action. It is clear this section only applies to review of administrative proceedings and has not been extended to appeals from superior court judgments. (See *Sullivan v. Calistoga Joint Unified School Dist.* (1991) 228 Cal.App.3d 1313, 1319 [279 Cal.Rptr. 529] [Gov. Code, § 800 does not apply to an appeal from superior court judgment denying teacher's petition for peremptory writ of mandate seeking reclassification].)

Similarly, Maria's request for attorney fees is also denied. Maria requests recovery of costs in the "interests of justice." She argues this court is able to award fees or an apportionment of costs we deem proper pursuant to California Rules of Court, rule 56.4(a). However, rule 56.4(a) is carefully crafted to exclude both criminal and juvenile cases. She is not entitled to fees under this section.

Maria also asserts this court has discretion to award her fees pursuant to Family Code section 3452.[6] However, she does not cite to, nor do we find any authority that supports the application of this section to juvenile dependency cases. Even if this section applies to dependency proceedings, we

---

requires that custody be taken from the father. [¶] Pursuant to 361.2(b)(2), the court does order maintenance services for mother, and the court is not ordering family reunification services for father. Custody of minors is to be vested with the mother under the supervision of social services."

[6]Family Code section 3452 states: "(a) The court shall award the prevailing party, including a state, necessary and reasonable expenses incurred by or on behalf of the party, including costs, communication expenses, attorney's fees, investigative fees, expenses for witnesses, travel expenses, and the child care during the course of the proceedings, unless the party from whom fees or expenses are sought establishes that the award would be clearly inappropriate."

cannot agree with her contention that this appeal is frivolous and that Abdulaziz attempts to attack her character. He lost physical custody of his children and has acted reasonably in appealing from that decision. The appeal is not frivolous.

The judgment is affirmed in all respects except the determination of jurisdiction. In that regard, it is remanded for a hearing concerning the compliance, vel non, with Family Code section 3424, subdivision (d).

Sills, P. J., and O'Leary, J., concurred.

On June 8, 2001, the opinion was modified to read as printed above.