TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 94-1104 |
| of | : | |
| | : | June 7, 1995 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| ANTHONY S. Da VIGO | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE BARBARA ALBY, MEMBER OF THE CALIFORNIA STATE ASSEMBLY, has requested an opinion on the following questions:

1. Would the institution of a needle exchange program for drug users by a county to prevent the spread of the HIV virus violate state law?

2. Would a declaration of a public health emergency by a county allow it to institute a needle exchange program for drug users?

3. Would the use of the "defense of necessity" by a county allow it to institute a needle exchange program for drug users?

CONCLUSIONS

1. The institution of a needle exchange program for drug users by a county to prevent the spread of the HIV virus would violate state law.

2. A declaration of a public health emergency by a county would not allow it to institute a needle exchange program for drug users.

1.                                                                                          94-1104

3. The use of the "defense of necessity" by a county would not allow it to institute a needle exchange program for drug users.

ANALYSIS

A county board of supervisors has proposed the adoption of a program to furnish sterile hypodermic syringes to drug users for personal use in order to prevent the spread of the HIV virus within the county. The three questions presented for resolution concern whether such a program would be lawful under any circumstances.

1.    Conflict With State Law

The first inquiry is whether the institution by a county of a needle exchange program for drug users would violate state law. We conclude that it would.

In *A & B Cattle Co.* v. *City of Escondido* (1987) 192 Cal.App.3d 1032, the court held that a city could not license the sale of drug paraphernalia to adults. It summarized the following principles of law that we find to be applicable here:

> "`Under the police power granted by the Constitution, counties and cities have plenary authority to govern, subject only to the limitation that they exercise this power within their territorial limits and subordinate to state law.' [Citation.] More specifically, article XI, section 7 of the California Constitution provides: `A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.' Where local legislation conflicts with general law, it is void. [Citations.] `Apart from this limitation, the "police power [of a county or city] under this provision . . . is as broad as the police power exercisable by the Legislature itself."' [Citations.]
>
> "A local legislative enactment will be invalidated when it duplicates, contradicts, or infringes upon an area completely occupied by general law, either expressly or by legislative implication. Moreover, where the subject matter of the local legislation has been entirely occupied by state general law, supplementary or complementary local legislation, even pertaining to matters otherwise properly characterized as municipal in character, is prohibited. [Citations.]" (*Id*., at p. 1038.)

In applying these principles to the proposed needle exchange program, we find that Health and Safety Code section 11364.7, subdivision (a),[1] provides as follows:

---

[1] Unidentified section references herein are to the Health and Safety Code.

"Except as authorized by law, any person who delivers, furnishes, or transfers . . . drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to . . . inject . . . or otherwise introduce into the human body a controlled substance . . . in violation of this division, is guilty of a misdemeanor."

The term "drug paraphernalia" includes hypodermic syringes, needles, and other objects designed for use in injecting controlled substances into the human body. (§ 11014.5, subd. (a)(7).) The term "person" includes an individual, corporation, government or governmental subdivision or agency, or any other legal entity. (§ 11022.)[2] The introductory clause "Except as authorized by law" may not be construed to encompass any local ordinance to the contrary. As noted below (fn. 4, post), legislation which would have authorized even a carefully circumscribed county pilot project twice failed enactment.

The Legislature's enactment of sections 11014.5 and 11364.7 demonstrate its intent to establish a total ban on the distribution of drug paraphernalia, so as to occupy the entire regulatory field to the exclusion of local legislation. (*A & B Cattle Co.* v. *City of Escondido, supra*, 192 Cal.App.3d at 1040.) As explained by the court in the *Escondido* case:

"In fact, it is difficult to believe the City is serious in its attempt to defend this ordinance which, on its face, purports to permit businesses to sell goods which are completely banned by state law, so long as the City issues a special local business license. . . .

"Indeed, local law enforcement officers must enforce state and local laws alike, and any sale or distribution of unlawful drug paraphernalia subjects the seller or distributor to arrest and fine under state law regardless whether licensed by the City." (*Id.*, at p. 1039.)

While sections 11014.5 and 11364.7, as interpreted by the court in the *Escondido* decision, control our analysis here, we note that in a different statutory scheme pertaining to county health officers, section 450 provides:

"The board of supervisors of each county shall take such measures as may be necessary to preserve and protect the public health in the unincorporated

---

[2]It is unlawful for any person not licensed as a registered pharmacist to dispense any dangerous device, including hypodermic syringes or needles. (Bus. & Prof. Code, §§ 4034.5, 4050.) It is unlawful for any person to furnish hypodermic syringes or needles without a permit issued by the State Board of Pharmacy, except as otherwise provided. (Bus. & Prof. Code, §§ 4140, 4382.) The term "person" for purposes of this licensing scheme includes political subdivisions of the state. (Bus. & Prof. Code, § 4039.)

territory of the county, including, if indicated, the adoption of ordinances, regulations and orders not in conflict with the general laws . . . ."

The exercise of the power to preserve and protect the public health by a county board of supervisors is expressly limited in section 450 to those measures which are not in conflict with the general laws of the state, including sections 11014.5 and 11364.7.

In answer to the first question, therefore, we conclude that the institution by a county of a needle exchange program for drug users to prevent the spread of the HIV virus would violate state law.

2.      Public Health Emergency

The second inquiry is whether a county may implement a needle exchange program for drug users if it first declares a "public health emergency." We conclude that it may not.

Under the California Emergency Services Act (Gov. Code, §§ 8550-8668; "Act"), a local emergency may be proclaimed by the governing body of a county or city or by an official so designated by ordinance. (Gov. Code, § 8630.) In periods of local emergency, political subdivisions have full power to provide mutual aid to any affected area in accordance with local ordinances, resolutions, emergency plans, or agreements. (Gov. Code, § 8631.)

The term "local emergency" is defined in the Act as follows:

> "`Local emergency' means the duly proclaimed existence of conditions of disaster or of extreme peril to the safety of persons and property within the territorial limits of a county . . . caused by such conditions as . . . epidemic . . . or other conditions . . . which conditions are or are likely to be beyond the control of the services, personnel, equipment, and facilities of that political subdivision and require the combined forces of other political subdivisions to combat . . . ." (Gov. Code, § 8558, subd. (c).)

The purpose of a declaration of local emergency is thus to provide for the rendering of mutual aid by the state government and all its departments and agencies and by the political subdivisions of the state in carrying out the purposes of the Act. (Gov. Code, § 8550.) During a local emergency, the governing body of a political subdivision "may promulgate orders and regulations necessary to provide for the protection of life and property. . . ." (Gov. Code, § 8634.)

In addition, for the purpose of exercising its power to preserve and protect the public health (§ 450), each county governing board is required to appoint a health officer (§

451), who "may take any preventive measure which may be necessary to protect and preserve the public health from any public health hazard during any . . . `local emergency,' as defined by Section 8558 of the Government Code, within his jurisdiction"  (§ 458).[3]

There can be little doubt that the proposed needle exchange program would be intended by the county to "provide for the protection of life and property" and "protect and preserve the public health" within the meaning of section 458 and Government Code section 8634.  The issue remains, however, whether the program would conflict with the laws of the state, even under a declaration of a public health emergency.

Specifically, do the broad powers granted under those sections, i.e., "may promulgate orders and regulations necessary to provide for the protection of life and property . . ." (Gov. Code, § 8634) and "may take any preventive measure which may be necessary to protect and preserve the public health . . ." (§ 458), fall within the "[e]xcept as authorized by law" provision contained within the prohibition of section 11364.7, subdivision (a), quoted above?  If so, a needle exchange program would not constitute a violation of the latter statute.

In resolving this issue, we note first that the broad powers based on a declaration of local emergency cannot be construed literally to encompass "any" orders, regulations, or preventive measures in violation of state law or policy.  (See 75 Ops.Cal.Atty.Gen. 256, 258 (1992).)  Where the means by which an official duty is to be accomplished is not prescribed, any means may be used which is both reasonable and suitable.  (*Harris* v. *Gibbins* (1896) 114 Cal. 418, 421; 73 Ops.Cal.Atty.Gen. 156, 164 (1990).)  Accordingly, in the execution of a particular statutory responsibility imposed by section 458 and Government Code section 8634, those charged with their administration must take cognizance of and effectuate, or at least refrain from acting in derogation of, other valid governmental policies.  (Cf. *Zabel* v. *Tabb* (5th Cir. 1970) 430 F.2d 199, 209; 74 Ops.Cal.Atty.Gen. 122, 124-125, n. 2 (1991); 73 Ops.Cal.Atty.Gen., *supra*, 163.)  It is well settled that statutory provisions must be construed with reference to the whole system of law of which they are a part so that all may be harmonized and have effect.  (*Walnut Creek Manor* v. *Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 268; *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387; *Gillett-Harris-Duranceau & Assoc.* v. *Kemple* (1978) 83 Cal.App.3d 214, 220.)

---

[3]Section 3110 also provides:

"Each health officer knowing or having reason to believe that any case of the diseases made reportable by regulation of the State Department of Health Services, or any other contagious, infectious or communicable disease exists, or has recently existed, within the territory under his jurisdiction, shall take such measures as may be necessary to prevent the spread of the disease or occurrence of additional cases."

Second, it is apparent from a comparison with the terms of section 450, which are not based on any declaration of emergency, that the broad terms of section 458 do not portend a radical departure from the powers otherwise granted and limited. Thus the power granted in section 450, i.e., "each county shall take such measures as may be necessary to preserve and protect the public health . . ." is not only expressed in substantially equivalent terms as in section 458, but is also expressly limited to such measures as are "not in conflict with general laws." Such broad terms, then, whether or not in the context of a local emergency, simply do not suggest an authority to disregard the general laws of the state. Accordingly, section 450, as well as section 452 directing county health officers to "enforce and observe . . . [s]tatutes relating to public health," are generally applicable in the absence of some unequivocally stated exemption.

Third, the Legislature has provided an illuminating example of the language it uses when it grants an exemption from compliance with state law. Government Code section 8571 prescribes the powers of the Governor during a state of emergency or state of war emergency (Gov. Code, § 8558, subds. (a), (b)) as follows:

> "During a state of war emergency or a state of emergency the Governor may suspend any regulatory statute, or statute prescribing the procedure for conduct of state business . . . where the Governor determines and declares that strict compliance with any statute . . . would in any way prevent, hinder, or delay the mitigation of the effects of the emergency."

Hence, when the Legislature has intended to authorize the suspension of state laws, it has done so in specific and unmistakable terms, rather than by inference or implication. It may reasonably be inferred that the absence of any such unequivocal provision in section 458 or Government Code section 8634 indicates an intent not to confer such authorization upon local entities. (See *Safer* v. *Superior Court* (1975) 15 Cal.3d 230, 238; 75 Ops.Cal.Atty.Gen., *supra*, 259.) That such an authorization for suspension should be unequivocally expressed is also consistent with the rule that exceptions to the general applicability of a statute (e.g., prohibiting the furnishing of drug paraphernalia) should be narrowly construed. (*City of Lafayette* v. *East Bay Municipal Utilities District* (1993) 16 Cal.App.4th 1005, 1017; 78 Ops.Cal.Atty.Gen. 31, 36 (1995).)

Finally, the powers granted by section 458 and Government Code section 8634 are expressly tied to the declaration of a local emergency. Such an emergency may not be declared simply as a basis for justifying the circumvention of state law by county officers. The conditions sought to be remedied by the county's proposed program are neither local in scope nor an "emergency" within the purview of the Act.

With respect to the issue of locality, the containment of the HIV virus is manifestly a matter of statewide concern involving a "comprehensive, coordinated government

action against AIDS and HIV infection."  (§ 195.)  The Legislature has expressly declared that "[t]he rapidly spreading AIDS epidemic poses an unprecedented major public health crisis in California, and threatens, in one way or another, the life and health of every Californian."  (§ 199.45, subd. (a).)  The Legislature has further found that "[t]he best hope of stemming the spread of the AIDS virus among the general public is the development of an AIDS vaccine to develop an immunity to exposure."  (§ 199.45, subd. (b); see also §§ 199.52, 199.55.)  In enacting the California AIDS Program, the Legislature intended, among other things, to (1) fund specified pilot AIDS education programs, clinical research, studies, and program evaluations, (2) promote an aggressive community-based HIV infection prevention program in all communities and areas where behaviors and prevalence indicate high risk of HIV infection, and (3) encourage local programs to involve racial and ethnic minorities in a leading role to plan the development, implementation, and evaluation of preventive education, HIV testing, delivery of care, and research activities that are necessary to the formation of a comprehensive, community-based, culturally sensitive HIV infection prevention strategy.  (§ 199.70.)  The Legislature has also provided that pilot programs to reduce the spread of AIDS through residential detoxification and outpatient detoxification and treatment services for intravenous drug users shall be initiated through local agency operated AIDS-related substance abuser programs.  (§ 199.76.)[4]

Further, the declaration of a local "emergency" within the meaning of Government Code section 8558 is reserved for the rendering of mutual aid under circumstances where the emergency conditions are or are likely to be beyond the control of the county's services, personnel, equipment, and facilities, and which require the combined forces of other political subdivisions to combat.  The proposed program in question, however, does not contemplate any mutual aid, but rather is predicated upon the county's utilization of its own services, personnel, equipment, and facilities.

In addition, an emergency as contemplated in the Act is essentially temporary in nature.  Government Code section 8630 provides in part:

". . . Whenever a local emergency is proclaimed by an official designated by ordinance, the local emergency shall not remain in effect for a period in excess of seven days unless it has been ratified by the governing body.  The governing body shall review, at least every 14 days until such local emergency is terminated, the need for continuing the local emergency and shall proclaim the

---

[4]During the 1991-1992 Regular Session, the Legislature presented the Governor with legislation which would have established the Clean Needle and Syringe Exchange Pilot Project (Assembly Bill No. 2525, Senate Bill No. 1418); The Governor vetoed the legislation on September 30, 1992.  Similarly, during the 1993-1994 Regular Session, the Legislature passed Assembly Bill No. 260, which the Governor vetoed on October 8, 1993.  Of course, the power to approve or veto bills passed by both houses of the Legislature is an integral part of the legislative process. (*Lukens* v. *Nye* (1909) 156 Cal. 498.)

termination of such local emergency at the earliest possible date that conditions warrant."

The proposed county program, on the other hand, is indefinite in length and not of such a nature that the need for continuation would warrant review every 14 days.

Accordingly, it is concluded that a county may not institute a needle exchange program for drug users pursuant to a declaration of a public health emergency.

3.       Defense of Necessity

The third inquiry is whether a county may institute a needle exchange program for drug users in reliance upon the "defense of necessity."[5]   We conclude that it may not.

The Legislature has never articulated a "defense of necessity."   With respect to the applicability of defenses for criminal conduct generally, the court in *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 632, stated in part:

"`In this state the common law is of no effect so far as the specification of what acts or conduct shall constitute a crime is concerned.  [Citations.]   In order that a public offense be committed, some statute, ordinance or regulation prior in time to the commission of the act, must denounce it; likewise with excuses or justifications - if no statutory excuse or justification apply as to the commission of the particular offense, neither the common law nor the so-called "unwritten law" may legally supply it.' (*People* v. *Whipple* (1929) 100 Cal.App. 261, 262.)"

Nevertheless, the court in *People* v. *Lovercamp* (1974) 43 Cal.App.3d 823, 831-832, concluded that the defense of necessity was viable under the following circumstances when a defendant is charged with the offense of escaping from prison:

"From all of the above, we hold that the proper rule is that a limited defense of necessity is available if the following conditions exist: (1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future; (2) There is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory; (3) There is no time or opportunity to resort to the courts; (4) There is no evidence of force or violence

_____

[5]In addition to the laws previously referenced, Penal Code section 424 provides that a public officer who uses public moneys for any purpose not authorized by law is punishable by imprisonment and disqualified from public office.

used towards prison personnel or other `innocent' persons in the escape; and (5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat."

The defense has been asserted, although unsuccessfully, in subsequent prison escape cases. (E.g., *People* v. *Condley* (1977) 69 Cal.App.3d 999; *People* v. *Wheeler* (1977) 68 Cal.App.3d 1056.)

With the exception of one case, *People* v. *Pena* (1983) 149 Cal.App.3d Supp. 14, the defense has never successfully been used outside of the prison context. (*People* v. *Patrick* (1981) 126 Cal.App.3d 952 [kidnap - abduction of daughter from religious cult]; *People* v. *Velasquez* (1984) 158 Cal.App.3d 418 [possession of deadly weapon in jail]; *People* v. *Weber* (1984) 162 Cal.App.3d Supp. 1 [trespass - nuclear protest]; *In re Weller* (1985) 164 Cal.App.3d 44 [trespass - to counter threat of nuclear war]; *People* v. *McKinney* (1986) 187 Cal.App.3d 583 [assault with deadly weapon in prison]; *People* v. *Morris* (1987) 191 Cal.App.3d Supp. 8 [reckless driving - to reach the scene of a medical emergency]; *People* v. *Beach* (1987) 194 Cal.App.3d 955 [child stealing - fearing safety of child]; *People* v. *Heath* (1989) 207 Cal.App.3d 892 [burglary - under threat of death from narcotics creditor]; *People* v. *Garziano* (1991) 230 Cal.App.3d 241 [criminal conduct during demonstration at abortion clinic].) In *People* v. *Pena*, *supra*, 149 Cal.App.3d Supp. 14, the defendant was charged with driving under the influence of intoxicating liquor. He claimed that he was driving only in order to follow and protect his girlfriend who was being driven home in a sheriff's patrol vehicle. On appeal, it was held that the trial court should have instructed the jury on the defense. However, that decision was thereafter criticized in *People* v. *Heath*, *supra*, 207 Cal.App.3d at 901, where the *Pena* court's confusion of the defenses of duress and necessity was found to be "clearly incorrect," and in *People* v. *Garziano*, *supra*, 230 Cal.App.3d at 243, where the *Pena* court's articulation of the necessity factors was found to be "excessively expansive."

In view of the foregoing, it is apparent that the defense of necessity, assuming its legitimacy, may not be applied to the distribution of drug paraphernalia pursuant to a county's needle exchange program under the guise of public health. The concept of promoting the public health by facilitating the use of and addiction to narcotics at the very least involves multi-faceted public policy considerations.[6] No case has suggested that the defense of

---

[6]For example, in his message of October 8, 1993, vetoing Assembly Bill No. 260, the Governor stated in part:

"There is an even more basic issue presented. The real question put by AB 260 is whether the hoped-for reduction in needle-transmitted HIV infection justifies sending a mixed message that will threaten to undermine the credibility of all of society's other anti-drug efforts - especially those preventive education efforts aimed at dissuading young audiences from choosing not to engage in drug use.

"In blunt terms, is it worth reducing the risk of infection to intravenous drug users at the

necessity may be applied to the promotion or facilitation of conduct by others which is itself unlawful.

The elements of the purported defense as defined by the courts are simply inapposite: a specific threat of death or substantial injury in the immediate future; the lack of time for complaint to the authorities; and the lack of opportunity to resort to the courts. As stated in the concurring opinion in *In re Weller*, *supra*, 164 Cal.App.3d at 51:

> "As to this case, however, it is clear that there is no defense by whatever name available to those who trespass or engage in other unlawful conduct to protest governmental policy. Whether the defense is characterized as `necessity' or `duress' or some hybrid of the two, `[u]nder any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law . . . the defenses will fail.' (*United States* v. *Bailey* (1980) 444 U.S. 394, 410; see, e.g., *United States* v. *May* (9th Cir. 1980) 622 F.2d 1000, 1008-1010 [necessity defense not available to defendants who protest Trident missile system at naval submarine base by trespassing].) There were other lawful forms of protest available to petitioners, and the trial court correctly rejected their defense of necessity."

In our system of government, the resolution of competing public policy considerations, and particularly those of statewide concern, rests with the Legislature. It is not incumbent upon each political subdivision to invoke the excuse of necessity for the implementation of its own contrary resolutions. A county possesses and may exercise only such powers as are granted to it by the Constitution or by statutes, together with those powers as arise by necessary implication from those expressly granted. (Gov. Code, § 23003; *Byers* v. *Board of Supervisors* (1968) 262 Cal.App.2d 148, 157; 77 Ops.Cal.Atty.Gen. 82, 82-83 (1994).)

It is concluded that a county may not institute a needle exchange program for drug users in reliance upon the "defense of necessity."

* * * * *

---

potentially far greater cost of undermining all our other preventive anti-drug efforts and suffering as a result an enormous increase in the number of young people who make a wrong choice that leads to an enormous increase in addicts?

"If we are going to demand that young people exercise personal responsibility, if we say that they must suffer the consequences of their personal choices, what are they to think when in the next breath we give formal sanction to a project which facilitates drug use?"